UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

Civil Action No. 03 CV 12517 MEL

MCF COMMUNICATIONS, INC. and )
OMNIPOINT HOLDINGS, INCORPORATED )
)
Plaintiff )
)
v. )
)
THE TOWN OF STOUGHTON, )
THE TOWN OF STOUGHTON ZONING BOARD OF APPEALS, )
and ALLAN R. KATZ, EDWARD F. COPPINGER, ORLANDO )
DiGIAMPIETRO, HERBERT MUSMON, STEVEN D. MITCHELL, )
and WILLIAM FRANCIS, individually and as they are members of the )
STOUGHTON ZONING BOARD OF APPEALS )
)
)
Defendants )

**MEMORANDUM IN SUPPORT OF PLAINTIFF'S
MOTION FOR SUMMARY JUDGMENT**

**I.   Preliminary Statement**

This case is presently before this Court on the motion of the Plaintiffs, MCF Communications ("MCF") and Omnipoint Holdings, LLC ("Omnipoint") (hereafter together, "the applicants"), for Summary Judgment and a declaration that the denial by the Stoughton Zoning Board of Appeals of their application for zoning relief was in violation of the Telecommunications Act of 1996 and ordering the Town to issue a variance, special permit and a building permit to the applicants. This memorandum of law is submitted in support of their motion.

This action arises out of the unlawful denial by the Zoning Board of Appeals ("the Board") of an application filed by the applicants for a special permit and variance under

the Stoughton Zoning By-law (the "By-law") to construct a 190' telecommunications monopole and related equipment. The denial of the requested zoning relief violated Section 704 of the Federal Telecommunications Act of 1996 (the "TCA"), 47 U.S.C. §332(c). As a result of the wrongful denial, the applicants filed a Complaint (the "Complaint") seeking an order directing the Board to grant the applications for a special permit and variance and a building permit.

The denial of the variance and special permit requests was not supported by substantial evidence in the written record, the decision impermissibly prohibits the provision of personal wireless telecommunications services, and it discriminates against Omnipoint as a provider of services that are functionally equivalent to those provided by competitors that have received similar zoning relief in the past.

**THE MOVING PARTIES REQUEST AN ORAL HEARING ON THEIR MOTION**

## II. UNDISPUTED FACTS

### A. MCF Communications, Inc.

MCF Communications is a provider of personal wireless communications facilities: it constructs and manages towers that support wireless transmitting equipment and rents space on those towers to FCC-licensed wireless carriers. Affidavit of Bradford Gannon, ¶ 3, attached to Motion for Summary Judgment as Exhibit A. Most of MCF Communications' customers and business partners are FCC- licensed providers of cellular and digital telephone services. Id. With respect to MCF Communications' proposed tower location in the Town, MCF Communications has entered into a lease agreement with Omnipoint Holdings, Inc., a FCC-licensed providers of wireless

communications services, and has received expressions of interest from other carriers as well. Gannon Affid., Exh. A at ¶ 4.

### B. Omnipoint and the PCS Technology

Omnipoint operates a communications venture committed to providing integrated wireless personal communications services (PCS) by building wireless networks in specified markets across the United States under license purchased from the Federal Communications Commission (FCC). Id. at ¶ 5. One of those market areas is in Southeastern Massachusetts and includes the Town of Stoughton. Id.

PCS technology is a new generation of wireless service that uses digital transmission to improve the services available to customers. Id. at ¶ 6  Omnipoint deploys a state-of-the-art Global Standard for Mobile (GSM) technology, which is an offshoot of Code Division Multiple Access (CDMA) technology. Id.

Unlike cellular services using analog-based systems, PCS digital technology converts voice and data signals into a stream of digits to allow a single radio channel to carry multiple simultaneous signal transmissions. Id. at ¶ 7. This allows Omnipoint to offer services unavailable in analog-based systems, such as secured transmissions and enhanced voice, high-speed data, paging and image capabilities as well as voicemail, call forwarding and call waiting. Id.

Mobile telephones using PCS technology operate by transmitting a radio signal to antennas mounted on a tower, pole, building, or other structure. The antenna feeds the signal to electronic devices housed in a small equipment cabinet or base station. The base

station is connected by microwave, fiber-optic cable, or ordinary telephone wire to the Base Station Controller, subsequently routing the calls throughout the world. Id. at ¶ 8.

Because the PCS system has a lower power signal and a much higher frequency than traditional cellular technology, the range between the PCS mobile telephone and the antennas is limited. Id. at ¶ 9.

In order to provide continuous service to a PCS telephone user, coverage must overlap in a grid pattern resembling a honeycomb. Id. In the event that Omnipoint is unable to construct a cell site within a specified geographic area, Omnipoint will not be able to provide reliable service to the customer within that area. Id.

Omnipoint's engineers use complex computer programs and extensive field-testing to complete a propagation study, which shows where cell sites need to be located in order to provide service. Id. at ¶ 10. The propagation study also takes into account the topography of the land, the coverage boundaries of neighboring cells and other factors such as population concentrations. Id. In order for the entire system to be operational, there must be properly placed cell sites installed and functioning so that "seamless" coverage can be realized, and only when the entire system is operational will a PCS telephone user be able to conduct an uninterrupted conversation throughout a given territory. Id. If there is no adequately functioning cell site within a given area, mobile customers in the area will experience an unacceptable level of dropped calls. Id.

### C. The Stoughton Site

Based upon its knowledge of the wireless market and the needs of the FCC licensed carriers to provide reliable service in major suburban towns, MCF identified a common geographic area in which carriers reported non-existent or unreliable coverage.

This common area of unreliable coverage started just south of the Easton – Stoughton line, went through Southwestern Stoughton and continued Northwest into Sharon.. Id. at ¶11

One of these carriers, Omnipoint, determined that it had a substantial gap in coverage in the southwestern section of Stoughton generally in the area where Bay Road separates the towns of Stoughton and Sharon, and advised MCF of its needs. Id. at ¶¶ 11, 13.

Working together, the applicants first sought to identify whether a sufficient number of existing structures exist in suitable locations to which a wireless provider could install its wireless transmitting equipment, before concluding that a new tower structure would be necessary. Id. at ¶13. The applicants determined that there are no existing structures. Id. The applicants also sought, and failed to locate, eligible sites situated in non-residential zoning districts. Id. at ¶14.

After reviewing numerous potential sites, MCF and Omnipoint send letters of inquiry to approximately 18 property owners having parcels of at least three acres.Id. at 15. Because of the restrictive requirements of the zoning by-law pertaining to wireless communications[1], there were very few land parcels suitable to the by-law and appropriate for development of a free standing monopole. Id.

At the conclusion of their evaluation, the applicants identified a property located at 76 Jordan Drive, owned by Daniel J. and Kathleen M. Andrews, which they determined to be suitable for development of a communications tower, and MCF entered into a lease for a portion of the property. Id. at ¶¶16, 19.

5

The Andrews property ("the site") is an irregularly shaped parcel of land comprising 11 acres and is located at the cul de sac of Jordan Drive. Id. at 17. The furthest corner of the lot is located more than 1000 feet from Jordan Drive. The lot abuts the Ames Rifle & Pistol Club to the rear. Id. It is located in a residential zone. Id.

The applicants also evaluated a parcel of land in neighboring Easton, abutting the Andrews property, that is owned by the Ames Rifle & Pistol Club. Both the Ames parcel and the Andrews parcel were located atop the highest elevation in the area and would provide similar visibility and RF coverage. Id. at ¶ 16. However, the Ames property would have required an access and utility run of several thousand feet, traversing wetland areas and requiring the clearing of many trees through dense forest. Id. at ¶18. Therefore, due to the prohibitive cost of construction and the difficulty of environmental permitting with a less intrusive alternative, the applicants determined that the Ames property was economically unfeasible. Id.

### D.  The Zoning By-law and Map

Unlike many communities within the Boston Metropolitan area, the Town of Stoughton has no zoning provisions that are uniquely specific to the regulation of personal wireless services facilities (PWSF). Rather, wireless facilities are regulated under the general use and dimensional regulations of the Stoughton Zoning Ordinance. See Town of Stoughton Zoning By-law, attached to Motion for Summary Judgment as Exhibit B.[2]

---

[1] See infra.
[2] For administrative convenience, only relevant portions of the certified copy of the zoning by-law have been attached.

Under the Use Table of the ordinance, "communications and television tower" is a use permitted in all zoning districts except the Commercial Business District (CBD) by special permit. Id. at p. V-10.

Under Section VI (G)(3) of the ordinance, there is only one "principal structure" permitted on any one lot. Id. at p. VI-1.

The ordinance provides that the minimum lot size in the Residential – Suburban A (RA) district is 55,000 square feet. Id. at p. VI-4.

The ordinance provides that the minimum frontage for a lot in the Residential-Suburban A district is 150 feet. Id. at p. VI-4.

During communications with the applicants prior to the filing of a zoning application, the Stoughton Zoning Enforcement Officer advised the applicants that a telecommunications structure could not be permitted on the same lot as the residence located on 76 Jordan Drive; and therefore, either a variance from the minimum frontage requirement would be required or a variance from the limitation of one principal use would be needed in order to place the telecommunications structure on its own lot. Gannon Affid., Exh. A at ¶25.

The Stoughton Zoning Bylaw's impact on wireless telecommunications facilities is thus: Absent a variance of one sort or another, a wireless telecommunications facility may only be permitted when it is the sole principal use on a lot which conforms in all respects to the by-law's dimensional requirements. Id. at ¶26. Consequently, where a facility is needed in an area comprised sole of residentially zoned land in Stoughton, a wireless facility must be the only principal use on a 55,000 square foot lot having a minimum of 150' of frontage. Id.

Based upon this analysis, the Stoughton Zoning By-law's limitations render the establishment of a zoning-compliant wireless telecommunications facility economically unfeasible. Id. at ¶27.

### C. The Plaintiffs' Application and Hearing

On or about June 12 and 13, 2003, MCF filed applications for a variance and a special permit with the Board. The variance application sought a variance from the minimum frontage requirement of the zoning ordinance so that an otherwise conforming eleven acre lot located at 76 Jordan Drive could be subdivided in order to conform to the "one principal use per lot" requirement. The special permit application sought a special permit pursuant to Section X (K) (Special Permits) of the zoning ordinance. Copies of each of the applications and related documents filed therewith are attached to Motion for Summary Judgment as Exhibit C. Both applications were heard on November 6, 2003, during which evidence was taken. Copies of the minutes of all public meetings at which the applications were scheduled for hearing are attached to Motion for Summary Judgment as Exhibit D.

During the course of the public hearing, the applicants presented evidence which demonstrated that there was a significant gap in Omnipoint's wireless coverage. Gannon Affid., Exh. A at ¶29. This evidence was comprised of an Affidavit of Radio Frequency Experts Anna Adkins and Richard Kala and "Odyssey" RF Coverage Maps demonstrating the existing conditions of T-Mobile (Omnipoint) coverage in the Town of Stoughton. See Affidavit of Radio Frequency Experts Anna Adkins and Richard Kala and related maps, attached as a portion of the application materials at Exh. C, at pp. 13-19. No

evidence or testimony was offered at any point during the public hearings to contradict this evidence. Gannon Affid., Exh. A at ¶30.

Also during the course of the public hearings, Omnipoint's agent, Kate Rugman, presented her oral testimony in support of written materials contained as part of the application materials. See Memorandum and materials entitled "Zoning Board of Appeals Application for a Special Permit and Variance for a Wireless Communication Facility," attached as a portion of Exh. C. During her testimony, Ms. Rugman requested that the Board add Omnipoint as a co-applicant. Gannon Affid., Exh. A at ¶31.

Also during the course of the public hearings, the applicants testified that they had performed a "crane test" to gauge the visibility of the proposed tower; and subsequently had conducted another "balloon" visibility test, of which Board members, neighbors and abutters were informed. Id. at ¶32 During both demonstrations, photographs were taken of the crane and balloons at various points. Id. Copies of the photographs from each test that were submitted into the record. No member of the Board attended either of the visibility demonstrations. Id. Copies of the photo submissions are attached to Motion for Summary Judgment as Exhibit E.

During the public hearing, less than five residents of the town objected to the proposed tower. Gannon Affid., Exh. A at ¶33.

At the conclusion of the variance hearing on November 6th, the Board voted unanimously to deny the variance application (but did not act on the special permit application). The decision was filed in the office of the Town Clerk on November 21, 2003. A copy of the decision denying the variance is attached hereto as Exhibit F. The

hearing on the special permit application was continued once again to November 20, 2003.

On November 20, 2003, the Board took further evidence on the special permit application and at the conclusion thereof, the Board voted unanimously to deny the special permit. On December 12, 2003, the Board's special permit denial was filed in the office of the Town Clerk. A copy of the decision denying the special permit is attached hereto as Exhibit G.

After the initiation of this appeal, the applicants conducted a third visibility demonstration, at the request of the Board, on July 10, 2004. During this demonstration, only two members of the Board who are named as parties to the appeal appeared at the cul de sac of Jordan Drive. Gannon Affid., Exh. A at ¶34.. They asked Mr. Gannon "when was the balloon being floated." Mr. Gannon informed them that the balloon had been up for several hours. Id.

### III.  SUMMARY JUDGMENT SHOULD ENTER ORDERING THE TOWN TO GRANT THE APPLICANTS A SPECIAL PERMIT AND BUILDING PERMIT

The applicants are entitled to Summary Judgment on its Complaint where they can establish that there is no genuine issue of material fact and that it is entitled to a judgment as a matter of law. *Town of Amherst v. Omnipoint*, 173 F.3d 9, 24; *Newbanks v. Central Gulf Lines, Inc.*, 64 F. Supp. 2d 1, 4 (D. Mass. 1999). A genuine issue of material fact exists if a reasonable juror could return a verdict for the non-moving party with all facts and inferences drawn in favor of the non-moving party. See Id.

A.   **There Are No Genuine Issues of Material Fact**

There is no genuine issue as to each of the material elements required for the Court to render relief on this Motion. Those facts are as follows:

1. Omnipoint established that it had a significant gap in its coverage in the southwestern portion of the Town of Stoughton and neighboring portion of the Town of Sharon.

2. The applicants established that they undertook an extensive search and analysis of potentially available sites within the coverage area.

3. The applicants established that they were unable to find an economically feasible alternative site.

4. The Stoughton Zoning By-law renders it economically unfeasible to construct a wireless facility that complied with the dimensional requirements of the by-law.

The applicants suppose that the Board would argue that both the visual impact on surrounding residences and the availability of an alternative site are material facts genuinely in dispute. However, without some objective evidence to back up such an assertion, its unsubstantiated opinions would not be sufficient, as a matter of law, to meet the substantial evidence standard of the Telecommunications Act. See *Omnipoint Communications MB Operations, LLC v. Town of Lincoln*, et. als., 107 F. Supp. 2d 108, 128 (D. Mass. 2000); *Telecorp Realty, LLC v. Town of Edgartown*, 81 F. Supp. 2d 257 (D. Mass. 2000).

B.   **Omnipoint Is Entitled To Judgment As A Matter of Law**

The applicants have established that, as a matter of law, the Town's action in denying their request for zoning relief was not based on substantial evidence and has the effective of prohibiting wireless services. For each violation of the Telecommunications Act of

11

1996, the Plaintiff's appropriate remedy is an order mandating the Town to grant the special permit and to issue a building permit therefore (upon appropriate compliance with the State Building Code).

The decision of the Zoning Board violates the TCA in three key respects. First, the decision is not supported by substantial evidence in the written record; and second, the decision represents an effective prohibition on the provision of personal wireless services insofar as it prohibits Omnipoint from filling a substantial gap in its coverage

### 1. The Decision is Not Supported By Substantial Evidence

The TCA expressly provides that any decision by a local government or zoning board to deny a permit, variance, or other zoning approval necessary to operate a wireless communications facility must be in writing and supported by substantial evidence contained in a written record. 47 U.S.C. § 332(c)(7)(B)(iii). The burden of proving that the record contains substantial evidence to support the decision rests with the local zoning board. *Sprint Spectrum L.P. v. Town of Easton*, 982 F. Supp. 47, 49 (D. Mass. 1997) ("the TCA shifts the burden of proof to the government agency that denied the applicant's siting request 'rather than burdening the applicant with producing substantial evidence supporting its approval'"). Substantial evidence requires "more than a mere scintilla" of evidence. *Western PCS II Corp. v. Extraterritorial Zoning Authority of the City and County of Santa Fe*, 957 F. Supp. 1230, 1236 (D. N.M. 1997). A reviewing court "must overturn the . . . decision under the substantial evidence test if it 'cannot conscientiously find that the evidence supporting that decision is substantial, when viewed in the light that the record in its entirety furnishes, including the body of evidence opposed to the

[zoning board's] view.'" Id. (quoting *BellSouth Mobility Inc. v. Gwinnett County, Ga.*, 944 F. Supp. 923, 928 (N.D. Ga. 1996))(alternations in original).

A written decision cannot merely state conclusory reasons for its basis. Rather, the decision "must provide some evidentiary basis to support each statement." *Omnipoint Communications, Inc. v. Foster Township*, 46 F. Supp. 2d 396, 403 (M.D. Pa. 1999); see also *Illinois RSA No. 3, Inc. v. City of Peoria*, 963 F. Supp. 732, 743 (C.D. Ill. 1997) ("Decision maker must make written findings and conclusions so that reviewing bodies may efficiently judge those findings and conclusions against the evidence and the record."). Put another way, the First Circuit Court of Appeals has stated that the decision "must contain a sufficient explanation of the reasons for the special permit denial to allow a reviewing court to evaluate the evidence in the record supporting those reasons." *Southwestern Bell Mobile Systems, Inc. v. Laurence M. Todd*, 244 F. 3d 51, 59 (1st Cir. 2001). Furthermore, "if the record as a whole contains conflicting evidence, the factfinder must adequately explain its reasons for rejecting or discrediting competent evidence." *Cellular Telephone Co. v. Zoning Board of Adjustment of the Borough of Ho-Ho-Kus*, 197 F.3d 64, 71 (3d Cir. 1999).

In light of the barren nature of the decisions, both devoid of even the flimsiest of reasons for their unanimous denial, it is quite apparent that both decisions fail to meet the minimum requirements for a written decision laid down in *Southwestern Bell*. The so-called "reasons" given for the denials, bare parroting of the statutory language, are "based upon unsubstantiated conclusions." *Omnipoint v. Lincoln*, 107 F. Supp. 2d at 128; *Telecorp Realty, LLC*, 81 F. Supp. 2d at 260.

13

### 2. The Board's Summary Conclusions Are Unsubstantiated

*None* of the summary conclusions reached by the Board are substantiated by "the record in its entirety . . . including the body of evidence opposed to the [zoning board's] view," *Western PCS II Corporation v. Extraterritorial Zoning Authority of Santa Fe*, 957 F. Supp. 1230, 1236; cf. Southwestern Bell, 244 F. 3d at 62 ("Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion. The reviewing court must take into account *contradictory evidence in the record*").[3] A review of these conclusions follows.

#### a. The Variance Decision

The unanimous denial of the variance request recites no evidence whatsoever before reciting that the application "has **NOT** met all the requirements of the Town…Zoning By-law…Section X, J, 1 (a through d)," and then attempts to recite the obverse of the statutory variance requirements.[4] See Variance Decision, Exh. F. The minutes of the public hearings provide no support for their decision either. See Minutes, Exh. D.

Most importantly, under similar circumstances this Court has found that a Board's finding that the variance standards have not been met is insufficient where the applicant has shown the existence of a substantial gap in coverage and the lack of an

---

[3] Indeed, the Board's decision does not even meet the deferential standard of review afforded the permit granting authority under Mass. G. L. ch. 40A. While Mass. G. L. ch. 40A § 15 does not require any *detailed findings* in order to support a denial of zoning relief, the decision must nevertheless include "adequate findings and reasons." Schiffone v. Zoning Board of Appeals of Walpole, 28 Mass. App. Ct. 981, 984 (1990). Even in Schiffone, the Board made specific findings of fact with respect to the particulars of the zoning by-law. In this matter, the Board simply parroted the literal language of the By-law with respect to zoning variances and special permits, without offering a single fact to support its conclusions.

[4] Amusingly, the decision cannot even accomplish this tricky feat, as it incorrectly ignores the double negative it has created in its recitation of specific condition (A).

14

alternative site. Even if the Board finds that the applicants' circumstances do not meet a strict application of this variance condition, Omnipoint's status as an FCC licensed wireless services provider and the existence of a significant gap in its coverage constitute other unique conditions which the Board must consider in order to apply its by-law in a manner that is consistent with the Telecommunications Act of 1996. See infra at 18.

a. The Special Permit Decision

The Special Permit Decision is practically the same. See Special Permit Decision, Exh. G. Stilted recitations are made with respect to how the proposed tower does not meet the by-law's special permit requirements; and although a few are made a with clumsy attempt at reasoning, there is absolutely nothing in the record to support the negative conclusions given:

"b). The requested use is NOT essential or desirable to the public convenience or welfare. There is no lot created to place the 190' monopole telecommunications tower on."

Aside from the apparent non-sequitur of this finding (what does the second sentence have to do with the first?), the documents submitted into the record plainly show that the applicants provided the Board with a lot plan showing a proposed subdivision alternative for their consideration. See Application, Exh. C, p. 23.

"c) The requested use **WILL** create undue traffic congestion or unduly impair pedestrian safety."

The applicants are at a complete loss to understand how the Board could conclude that an unmanned facility located hundreds of feet into the thick woods at the end of a cul de sac could impose either traffic or pedestrian problems. There is certainly nothing in the

15

record to raise either issue, and the only evidence, contained in the written application materials, supports the opposite conclusion. See, Application, Exh. C. at pp 8-9.

"f) The requested use **WILL** impair the integrity or character of the district or adjoining zones, nor be. (sic) detrimental to the health, morals or welfare. Documents presented show that this location may not be the best district to locate tower, the tower could be place (sic) in a better location."

Setting aside the syntax problems, the Board's conclusion that there *might* be a better place for a tower is just the type of unsubstantiated conclusion that this Court has found repugnant to the TCA. In *Telecorp Realty LLC,*. 81 F. Supp. 2d 257, the Planning Board determined, without making any investigation of its own, that the proposed site was not the "best" site, and that a "less offensive" site would be more suitable. The Court found that "to allow local government to deny a telecommunications provider's application . . . based on unsubstantiated conclusions would be to frustrate the purpose of the TCA." Id. at 260.

These unsubstantiated opinions, made apparently without regard for or reference to the clearly countervailing photo-simulations in the record (see Visibility Demonstration Photos, Exh. E), cannot form the basis for substantial evidence. *Nextel Communications of the Mid-Atlantic, Inc. v. Town of Sudbury*, 2003 WL 543383 at 143 (D. Mass. 2003); *Telecorp Realty LLC*, 81 F. Supp. 2d at 260. This should be especially apparent where only a few residents of the neighborhood, or the town as a whole, opposed the application at any time on that, or any other, basis. Gannon Affid., Exh. A at ¶33.

Although visual or aesthetic concerns may form the basis of a denial, they must be supported by substantial evidence. See *360 Communications Co. v. Bd. of Supervisors*,

50 F. Supp. 2d 551, 559-560 (W.D. Va. 1999). Substantial evidence includes opinions from real estate appraisers that property values would decrease. See *Foster Township*, 46 F. Supp. 2d at 408; *Illinois RSA No. 3, Inc.*, 963 F. Supp. at 738, 745. Or in this case, it might entail some testimony that contradicts the photo-simulations submitted by the applicants. Cf. *Southwestern Bell*, 244 F. 3d at 61. But there was nothing in the record to contradict the photos, and the Board members themselves passed on the opportunity to view the visibility demonstration for themselves. Gannon Affid., Exh. A at 32.

### 3. The Decision Effectively Prohibits The Provision of Wireless Services

The Telecommunications Act "has been interpreted to prohibit regulatory schemes that prevent providers from establishing the infrastructure necessary to avoid 'significant gaps' in the coverage they offer." *Omnipoint v. Lincoln*, 107 F. Supp. 2d at 117-119; *Ho-Ho-Kus*, 197 F.3d at 70. In order to show that a decision is unlawful on this ground, "[a] provider . . . cannot rely simply on the fact that a permit application has been rejected, but must establish that 'further reasonable efforts are so likely to be fruitless that it is a waste of time even to try.'" Id. at 108; *Omnipoint v. Westford*, 206 F. Supp. 2d 166, 170 (D. Mass. 2002); *Town of Amherst, N.H. v. Omnipoint Communications Enterprises*, 173 F.3d 9, 14 (1st Cir. 1999). It establishes this by "demonstrating that no feasible alternatives exist to the plan for which permission is denied." Id. at 14-15; *Sprint Spectrum*, 176 F.3d at 640-641, 643; *Omnipoint v. Lincoln*, 107 F. Supp. 2d at 116-120.

#### a. Omnipoint Has Established a Significant Gap in Coverage

The record reflects without contradiction that the applicants established a significant gap in coverage in the area of southwestern Stoughton. Omnipoint's RF coverage plots established that gap in coverage encompasses a substantial stretch of

southwestern Stoughton and Sharon, running along the Bay Road municipal boundary. See Gannon Affid., Exh. A at ¶ 29, Application, Exh. C at pp. 13-19. The coverage maps show a gap of some two miles in distance, representing an area in which "a remote user of those services is unable either to connect with the land based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted conversation." *Ho-Ho-Kus*, 197 F.3d at 70.

There is no evidence in the written record disputing the facts offered by Omnipoint that there is such a gap in coverage.

### b. The Applicants Established That It Is A Waste Of Time To Attempt To Locate An Alternative Site

In *Nextel v. Wayland* 231 F. Supp. 2d 396 (D. Mass. 2002) and *Omnipoint Communications MB Operations, LLC v. Town of Lincoln*, 107 F. Supp. 2d 108 (D. Mass. 2000), this District Court held that a municipality must approve a wireless facility if denying the petition would result in a "significant gap" in wireless services within a municipality because such denial would amount to an effective prohibition of wireless services. See 47 U.S.C. § 332(c)(7)(B)(i)(II). The *Lincoln* court recognized that "an effective prohibition can exist even where a town allows for the erection of [wireless communications facilities] but subject to criteria which would result in incomplete wireless services within the town, i.e., significant gaps in coverage within the town." *Town of Lincoln*, 107 F. Supp. 2d at 117. The *Wayland* court held that *"the need for closing a significant gap in coverage, to avoid an effective prohibition of wireless services, constitutes another unique circumstance when a zoning variance is required (emphasis added)."* *Town of Wayland*, 231 F. Supp. 2d at 406-407.

While the Board's decisions provide no hint as to how an applicant for a wireless facility in a residential area can satisfy the zoning by-law, it is apparent that doing so without the granting of extraordinary zoning relief in the form of a variance is economically unfeasible, and therefore, prohibitive. See Gannon Affid., Exh. A at ¶ 28.

Alternatively, if the Board's interest was in compelling the applicants to pursue an alternative site (Ames Rifle and Pistol Club) located in the neighboring town of Easton, such a policy would itself run afoul of the TCA. *Nextel Communications of the Mid-Atlantic v. Town of West Boylston*, Case No. 00-10224 – DPW (D. Mass. 2000). But the Board was not even that specific, simply rejecting the proposed site without offering any notion of possible alternative locations they would consider appropriate. Confronted with the applicants' evidence that no feasible alternative site exists, the Board has a legal obligation under the TCA "to show that [the applicants'] evidence was factually insufficient, or to come forward with evidence of its own demonstrating a trialworthy dispute." *National Tower v. Frey*, 164 F. Supp. 2d 185, 190 (D. Mass. 2001); *Omnipoint Holdings, Inc. v. Westford*, supra at 172.

In this case, the applicants did not even have the benefit of such an alternative site as AT&T Wireless had available to it in the Town of Concord, where the carrier had an alternative site, owned and solicited by the town, no less, that was "not available to it on commercially reasonable terms." *AT&T Wireless PCS, Inc. v. Town of Concord et als.*, 99-CV-11866-RWZ.[5]

---

[5] For an alternative to be reasonable, it must, "at a minimum, provide a high level of wireless service, its cost must be within or close to the industry wide norm for establishing new service under similar circumstances, it must employ commonly used technology, and it must be logically feasible." *360 Communications Co. v. Bd. of Supervisors*, 50 F. Supp.2d 551, 559-60 (W.D. Va. 1999).

On the basis of the foregoing, Omnipoint respectfully submits that it has established that a significant gap in coverage exists in the southwestern section of the town of Stoughton, and that there are no feasible alternative sites available within that corridor that enable it to fill such a gap. Therefore, Omnipoint has established the merits of its claim that the Board's decision has resulted in an effective prohibition of wireless services in violation of the Telecommunications Act of 1996.

## IV. CONCLUSION

For the foregoing reasons, the Motion for Summary Judgment should be granted, and the Court should enter an Order directing the Defendants to issue a special permit, variance and building permit for the installation of an antenna as described in the application for special permit and variance submitted by Omnipoint.

Respectfully submitted,
MCF Communications, Inc. and
Omnipoint Holdings, Inc.
By its Attorneys,

_____
Peter B. Morin, BBO# 355155
McDermott, Quilty & Miller LLP
21 Custom House Street, Suite 300
Boston, MA 02110
(617) 946-4600