UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

C.A. NO. 03CV12517-MEL

MCF COMMUNICATIONS, INC. and OMNIPOINT
HOLDINGS, INCORPORATED,

      Plaintiffs

v.

THE TOWN OF STOUGHTON, THE TOWN OF
STOUGHTON ZONING BOARD OF APPEALS, and
ALLAN R. KATZ, EDWARD F. COPPINGER,
ORLANDO DiGIAMPIETRO, HERBERT MUSMON,
STEVEN D. MITCHELL, and WILLIAM FRANCIS,
individually and as they are members of the
STOUGHTON ZONING BOARD OF APPEALS,

      Defendants

DEFENDANTS' MEMORANDUM
IN OPPOSITION TO PLAINTIFFS'
MOTION FOR SUMMARY
JUDGMENT

This case raises the question of whether a tower-building company, for reasons of

business convenience, may locate a 190-foot high telecommunications tower in a residential

neighborhood without satisfying the requirements of local zoning laws where the company

cannot prove that the denial violates federal law, the Telecommunications Act of 1996, 47

U.S.C. §332(c)(7) ("TCA").  For the reasons argued herein, the Town of Stoughton and

Stoughton Zoning Board of Appeals (collectively "Stoughton" and, in context, "Town" or

"Board") maintain that the Motion for Summary Judgment filed by the plaintiffs MCF

Communications, Inc. ("MCF") and Omnipoint Holdings, Incorporated ("Omnipoint") must be

denied and judgment entered affirming the Board's decisions denying MCF a variance and

special permit for the tower at 176 Jordan Drive, Stoughton, Massachusetts (the "Site").  As

demonstrated by the record of the Board's proceedings (Exhibit B to Stoughton's Opposition

("Town Ex.") and Exhibits B, C, D, E, F and G to the plaintiffs' Motion for Summary Judgment ("MCF Ex."), and the Affidavit of David P. Maxson ("Maxson Aff."), there is no genuine dispute of material fact and Stoughton is entitled to judgment as a matter of law under F.R.Civ.P. 56. In the alternative, if the Court finds that there is a genuine dispute of material fact regarding whether the Board's decisions or the Town's policies prohibit Omnipoint from providing personal wireless services, summary judgment must be denied.

Judgment as a matter of law should be entered for Stoughton because the Board's decisions are supported by substantial evidence contained in a written record as required by the TCA. Additionally, MCF, which is not a provider of personal wireless services, does not have standing to assert a claim under the TCA that Stoughton has effectively prohibited the provision of personal wireless services. Finally, Omnipoint (and MCF, assuming *arguendo*, that it has standing) has not met its heavy burden of proof that the decisions or the Town's policies prohibit the provision of personal wireless services. In the alternative, Stoughton contends that there are genuine disputes of material fact regarding whether Omnipoint has a significant gap in its coverage and whether further efforts to locate a facility other than on the Site would be futile.

FACTS

The Town's Zoning By-law, "Table of Use Regulations, Principle Uses," #21, allows "Communications or television tower" by special permit in a residential zoning district. Town Ex. A, p. V-10. The By-law, §VI.G.3, provides that, but for exceptions not here relevant, "only one principal structure shall be permitted on a lot." Id. p. VI-1. The Site is located in the Residence A ("RA") zoning district and a house, which is a principal use, already is located on the lot. Town Ex. B, p. 3-4. The By-law, Table of Dimensional and Density Regulations, #(10) requires a lot in the RA district to have a minimum frontage of 150 feet. Town Ex. A, p. VI-4.

Thus, without creating a separate lot with sufficient frontage or a variance, the tower could not be built on the same lot as the existing house. Town Ex. B, p. 4; MCF Ex. C, p. 32.

On June 12, 2003, MCF filed an application with the Board for a special permit for its proposed 190-foot high tower. At the same time, MCF applied for a variance from the 150-foot minimum frontage requirement, in effect to allow the creation of a separate lot for the tower. Town Ex. B, pp. 3, 33; MCF Ex. pp. 1, 31. In accordance with the information stated on MCF's application, the Board duly published notice and held public hearings. Town Ex. B, pp. 1, 2. During the public hearings, the Board heard oral and written evidence and following the hearing, the Board prepared a written "Statement of Fact" for each application, including a transcript of the testimony and the Board's discussions as well as some documents submitted by MCF, Omnipoint and persons opposed to the applications. Town Ex. B, pp. 31-32, 33-59.

Explaining the reason for the frontage variance, MCF's attorney stated: "it is admittedly a result of our desire to create a lot on which this tower can be located. . . Certainly the need for the Variance is caused by our desire to create a lot." Town Ex. B, p. 21. At the variance hearing, Board members further questioned the attorney regarding whether, even if the frontage variance were granted, the new lot would comply with the By-law's lot width and setback requirements. Town Ex. B, pp. 21-22. Commenting on MCF's position, a Board member stated: "I don't see the hardship here. I think the hardship is self-created. . . ." Id. p. 23.

The plans submitted by MCF for a 190-foot-high tower show that Omnipoint would be located at 160 feet. MCF Ex. C, p. 42. No evidence was submitted regarding Omnipoint's need for a 190-foot high tower and Omnipoint based its coverage projections at a tower height of 160, not 190, feet. Town Ex. B, pp. 52, 53; MCF Ex. C, pp. 18, 19. According to MCF, its interest was to provide "**co-location** opportunities for the six national wireless mobile phone service providers." MCF Ex. E, first page. No evidence was submitted from any of these providers

3

indicating an interest in the Site or that such a provider required a 190-foot high tower. The record shows that Omnipoint did not necessarily require a facility at the Site: the evidence was that it wanted a facility "located at or near the Site." MCF Ex. C, p. 16, ¶18 (emphasis added).

The Board heard evidence regarding the quiet nature of the Jordan Drive neighborhood off of Bay Road. A resident of Jordan Drive for nine years, Nancy Tucker testified that she "chose to live in this location on Bay Road to get away from commercial [activity] and to have the privacy and the peace and serenity that the location offers." Town's Ex. B, p. 9. Similarly, Kathleen Buckley, the closest abutter to the proposed tower, testified that she had bought her house "17 years ago to get out of the hustle and bustle and I don't want to look at a tower." Ms. Buckley further testified that the tower would be visible from her home, despite the photographs taken by MCF. She also identified the disruption that commercial traffic to service the tower would have on the neighborhood. Id. p. 10. Karen Chan of 40 Jordan Drive testified, id. p. 12:

> We moved here like many of the other people here because we wanted to be in a very quiet area with a cul-de-sac and . . . we strongly object to having a lot of commercial vehicles in the area. Another issue for us that we are strong believers in fung-shei . . . it has to do with the landscaping and location of your home and all the surrounding areas around it and I can tell you that 190' tower being stuck straight into the land, is not considered very good fung shei.

The Board also received evidence in the form of a petition from many residents of the Bay Road area stating their opposition to the proposed tower, for, among other reasons: "Visual Amenity" . . . "Bay Road is a treasure. It is a landmark. We choose to live in this area and pay a premium in taxes for peace, serenity and lack of commercial traffic." Id. p. 26.

After discussion, the Board voted to deny the variance and filed its written decision with the Stoughton Town Clerk on November 21, 2003. MCF Ex. F. The Board denied the variance because: "the petitioner has **NOT** met all the requirements of the Town of Stoughton Zoning By-Law of 1970, as amended, Section X, J, I (a through d) and more specifically as follows:

A)   Conditions and circumstances **ARE NOT** unique to the appellant's lot, structure or building and do not apply to the neighboring lands, structures or building in the same district.

C)   The unique conditions and circumstances **ARE** the result of actions of the applicant taken subsequent to the adoption of this by-law.

D)   Relief, if approved, **WILL** cause substantial detriment to the public good or impair the purposes and intent of this by-law.

Regarding the special permit, the Board recognized that without the variance, the tower could not be constructed. Nonetheless, the Board did not end its inquiry there; it considered MCF's evidence that under the TCA a 190-foot high tower at the Site was chosen to close a significant gap in wireless coverage. MCF contended that the Site was chosen because the property owners responded positively to the company and because access to the Site would be easier than from an alternative location, known as the Gun Club, just over the Stoughton-Easton town-line in Easton. Town Ex. B, p. 38; MC Ex. E, first page. Regarding this evidence, one Board member explained his reasons for not approving the permit: "I am not in favor because they have no separate lot. They're not sure if this is the best location and they testified that they have another location, the gun club." The other Board members agreed. Town's Ex. B, pp. 44, 56; MCF's Ex. E, first page. The Board's written decision (MCF Ex. G) states:

By a unanimous decision, the Board voted to **Deny** the Special Permit requested as the petitioner has met **Not** all the requirements of the Town of Stoughton Zoning By-law of 1970, as amended, Section X, K, 1 (a through f) and more specifically as follows:

b)   The requested use is **Not** essential or desirable to the public convenience or welfare. There is no lot created to place the 190' monopole telecommunications tower on.

c)   The requested use **Will** create undue traffic congestion or unduly impair pedestrian safety.

f)   The requested use **Will** impair the integrity or character of the district or adjoining zones, nor be. detrimental to the health, morals or welfare. Documents presented show that this location may not be the best district to locate tower, the tower could be place in a better location

In addition to the facts contained in the Board's written record, plaintiffs claim that the Board's decisions and the Town's policies violate the TCA by prohibiting the provision of personal wireless services and that issue is decided *de novo* and not on the Board's written record

5

(see, *infra*, p. 14, n. 4). In responding to this claim, the Town relies upon the Affidavit of David P. Maxson, a radio frequency engineer. As Mr. Maxson explains: Omnipoint has not proven that it has a gap in coverage, much less a "significant gap," or that there is no alternative feasible location for a facility, assuming such a gap exists. Maxson Aff. ¶¶29-38, 45-47, 58-64. Omnipoint's computer simulations purporting to show the location and extent of the gap are based on incomplete and faulty methodology and thus may not be relied upon to establish whether there is gap and whether it is significant. Id. ¶¶30-38. The location of the purported gap, as well as its size, is inconsistently described by the plaintiffs. Id. ¶¶36-37, 45-47. It is thus not possible to determine whether there is a gap, whether it is significant and whether a 190-foot-high tower at the Site is the only way to cover the gap. Id. ¶¶43-44. Moreover, since Omnipoint would be located at the 160-foot high position and in the absence of evidence from any other provider of personal wireless services regarding that provider's needs, the 190-foot high tower is much higher than necessary, even to serve Omnipoint. Id. ¶¶40-44.

Additionally, plaintiffs failed to investigate or did a cursory investigation of several alternative sites, including the Sharon Country Club. Id. ¶¶47-51. Significantly, the Ames Gun Club ("Gun Club"), an abutting property to the Site (a property therefore "near" the Site), and a location all agreed would be less visually intrusive than the Site, was rejected not because that location would not provide coverage, but because MCF decided that it was "economically unfeasible." MCF Ex. A, ¶18, Ex. E, first page. However, plaintiffs produced no evidence as to the cost of developing the Gun Club site. Since typically the minimum annual rent to be realized from a telecommunications tower is $144,000 (Maxson Aff. ¶62), in the absence of a comparison between development costs and potential revenue, there is no evidence that the Gun Club was economically unfeasible. Id. ¶¶58-59, 62, 63. There also was no evidence that further efforts to pursue the Gun Club location would be futile.

## ARGUMENT

A.    The Purpose Of The TCA Is To Balance The Traditional Control That Local Communities Have Over Zoning And Land Use Matters With Federal Law Regarding The Development Of The Wireless Communications Industry.

The TCA, 47 U.S.C. §332(c)(7), "is a deliberate compromise between two competing aims – to facilitate nationally the growth of wireless telephone service and to maintain substantial local control over siting of towers." (Emphasis added.) Amherst, N.H. v. Omnipoint Communications Enterprises, Inc., 173 F.3d at 13. Section 332(c)(7)(A) of the TCA explicitly preserves traditional state and local authority over the placement and construction of personal wireless service facilities:

> Except as provided in this paragraph, nothing in this Act shall limit or affect the authority of a State or local government or instrumentality thereof over decisions regarding the placement, construction, and modification of personal wireless service facilities.

The statute therefore balances the interests of the industry with those of local communities and gives communities considerable discretion regarding the siting of wireless service facilities. AT&T Wireless PCS, Inc. v. City Council of the City of Virginia Beach, 155 F.3d 423, 428-29 (4th Cir. 1998). As the First Circuit explained in Southwestern Bell Mobile Systems, Inc. v. Todd, 244 F.3d 51, 57 (1st Cir. 2001) ("Todd"): "though Congress sought to encourage the expansion of personal wireless services, the TCA does not federalize telecommunications land use law." Contrary to the thrust of plaintiffs' argument, the TCA does not mandate the expansion of telecommunications facilities at the expense of local land use considerations. And, the TCA does not confer the right to construct a telecommunications facility wherever a wireless company chooses, Amherst, NH, 173 F.3d at 15, because the Act protects "personal wireless services, not the facilities that provide those services." Cellular Telephone Co. v. Zoning Bd. of Adjustment of the Bor. of Ho-Ho-Kus, 197 F.3d 64, 71 (3rd Cir. 1999) ("Ho-Ho-Kus")(emphasis in the original).

When these principles are applied to this case, it is clear that Stoughton's interest in regulating the location of a 190-foot high tower consistently with traditional local zoning considerations must prevail over MCF's choice of the Site for reasons of business convenience.

B.    The Board's Decisions Denying The Variance and Special Permit Are Supported By Substantial Evidence Contained In A Written Record.

The TCA, 47 U.S.C. § 332(c)(7)(B)(iii), provides: "any decision by a State or local government or instrumentality thereof to deny a request to place, construct, or modify personal wireless service facilities shall be in writing and supported by substantial evidence contained in a written record." By now there is a well-developed body of law applying the substantial evidence standard of review to local zoning decisions under the TCA. As the First Circuit ruled in Todd, 244 F.3d at 58: "The 'substantial evidence' standard of review is the same as that traditionally applicable to review of an administrative agency's findings of fact . . . Judicial review under this standard, 'even at the summary judgment stage, is narrow. [Citation omitted].'" Moreover, "[t]he substantial evidence test is highly deferential to the local board." Second Generation Properties, L.P. v. Town of Pelham, 313 F.3d 620, 627 (1st Cir. 2002) ("Pelham"). So long as the record developed by the Board supports the ultimate decision and is consistent with state law, the decision must be affirmed. Id. at 628; Omnipoint Communications MB Operations, LLC v. Town of Lincoln, 107 F.Supp.2d 108, 116 (D. Mass. 2000) ("Lincoln"). Indeed, it is not the reviewing court's role to determine "whether the [board] made the best or correct decision." ATC Realty, LLC v. Town of Kingston, NH, 303 F.3d 91, 99 (1st. Cir. 2002) (reversing district court ruling that permit denial not based upon substantial evidence). So long as a board's decision is supported by a reasonable basis in the record, which is "more than a scintilla of evidence," the TCA requirement of a "procedural safeguard" to assure consistency with "applicable zoning requirements" is satisfied. Id. at 94-95.

The plaintiffs, while paying lip service to this standard of review, in effect, ask the court to independently evaluate and weigh the evidence in the hope that the court will reach a conclusion favorable to them. This approach is absolutely contrary to the well-defined standard of review applicable to TCA cases. Moreover, by their numerous snide comments regarding the Board's grammar and syntax and by quibbling with the precise wording of the decisions, plaintiffs are promoting form over substance and impermissibly attempting to hold a lay board to a decision-making standard rejected by the courts:

> Passage of the TCA did not alter the fact that the local boards that administer the zoning laws are primarily staffed by lay people. Though their decisions are now subject to review under the TCA, it is not realistic to expect highly detailed findings of fact and conclusions of law.

Todd, 244 F.3d at 59. In the Pelham decision, the First Circuit citing and quoting Todd, reiterated the correct standard: "while their [local board's] decisions must be in writing, the boards need not make extensive factual findings in support of their ultimate decision. . .The findings here are sufficient to permit judicial review, and that ends the challenge." 313 F.3d at 629. So too here, the Board's record and decisions satisfy the TCA.

    1.   The variance denial was based on substantial evidence.

The record establishes that MCF applied for the variance to create a separate lot for the tower. As MCF's attorney stated, the reason for the variance "is admittedly a result of our desire to create a lot on which this tower can be located.... Certainly the need for the Variance is caused by our desire to create a lot." Town Ex. B, p. 21. This reason is irrelevant to any of the factors that could justify the issuance of a variance under state law or the Town's By-law in that it has nothing to do with the soil conditions, shape or topography of the Site. G.L. c.40A, §10;

Town Ex. A, §X.J., p. X-3. The Board therefore had no basis upon which to grant the variance.[1]/

Accordingly, the Board's first reason for denial ("Conditions and circumstances **ARE NOT**

unique to the appellant's lot, structure or building and do not apply to the neighboring lands,

structures or building in the same district") is supported by substantial evidence.

The second reason, "C) Conditions and circumstances **ARE** the result of actions of the

applicant taken subsequent to the adoption of this by-law," is similar to the first reason and also

is supported by substantial evidence because the reason is based on the applicant's testimony to

the Board. Town Ex. B, pp. 4, 21; MCF Ex. C, p. 32. The third reason, "D) Relief, if approved,

**WILL** cause substantial detriment to the public good or impair the purposes and intent of this

by-law," is supported by the testimony of the residents of the neighborhood regarding the current

character of the neighborhood as being non-commercial, very quiet, serene, and as having no

commercial traffic. Town's Ex. B, pp. 9, 10, 16, 17.

In an effort to circumvent the evidence in the record that supports the decision, the

plaintiffs go off on their "prohibition" argument, contending that "Omnipoint's status as an FCC

licensed wireless services provider and the existence of a significant gap in its coverage"

mandated the issuance of the variance. MCF Memorandum, p. 15. This argument is misplaced

because it confuses two separate aspects of judicial review under the TCA – "substantial

evidence" and "prohibition" – aspects that are clearly distinguished in the case law. As

explained above, a reviewing court first determines whether a decision is supported by

---

[1]/      Plaintiffs argue, Memorandum n. 3, that "the Board's decision does not even meet the
deferential standard of review afforded . . . under Mass.G.L. ch.40A [the State Zoning Act]."
This argument is completely contrary to settled state law holding that an applicant for a variance
under Mass. G. L. c. 40A, §10 is not entitled to any relief and that a board has broad discretion to
deny a variance even if evidence shows that it could have been granted. Pendergast v. Board of
Appeals of Barnstable, 331 Mass. 555, 557, 120 N.E.2d 916, 918 (1954). Moreover, the statutory
criteria must be strictly construed, and even where the applicant shows some evidence, a variance
is to be sparingly granted. Damaskos v. Board of Appeals of Boston, 359 Mass. 55, 60-61, 267
N.E.2d 897, 901-02 (1971).

substantial evidence in the record; and if the decision is so supported, that is the end of the

discussion. Whether a decision, even if so supported, could still violate the "anti-prohibition"

requirement is a different question, determined on different criteria. Pelham 313 F.3d at 629;

Lincoln 107 F.Supp.2d at 117. Accordingly, plaintiffs' argument that the variance should have

been granted because services would otherwise be prohibited is not a reason for the Court to find

that the denial was not based upon substantial evidence. Perhaps in recognition of this, plaintiffs

admit "that the applicants' circumstances do not meet a strict application of this variance

condition" (MCF Memorandum, p. 15).

    2.    The Board's denial of the special permit is based on substantial evidence.

        Similarly, plaintiffs' arguments essentially address their prohibition claim and do not

recognize that there is ample evidence in the record to support the discretionary decision to deny

the special permit.[2]/  The Board's first reason for denying the special permit was:

> b)    The requested use is **Not** essential or desirable to the public convenience or
> welfare. There is no lot created to place the 190' monopole telecommunications
> tower on.

        As explained above regarding the variance, MCF's representatives testified that there was

no separate lot for the tower. Without a separate lot, the tower would be prohibited because the

By-law bars two principal uses on a lot and establishes minimum lot frontage (as well as other

dimensional criteria) for a lot. Thus, unless there was a separate lot for the tower, the Board

could not approve the use without violating its own By-law. The first finding therefore rests on

---

[2] /    Under Massachusetts law, there is no entitlement to a discretionary special permit. Gulf Oil Corporation v. Board of Appeals of Framingham, 355 Mass. 275, 277-278, 244 N.E.2d 311, 313 (1969). In reviewing a decision to deny a special permit, the court must defer to a board and affirm the decision unless the evidence establishes that the decision was unreasonable, based on a legally untenable ground, or is arbitrary or capricious. ACW Realty Management, Inc. v. Planning Board of Westfield, 40 Mass. App. Ct. 242, 246, 662 N.E 2d 1051, 1055 (1996). A decision on a special permit is not arbitrary or capricious simply because the evidence shows that the permit could have been granted. Subaru of New England, Inc. v. Board of Appeals of Canton, 8 Mass. App. Ct. 483, 486, 395 N.E 2d 880, 882 (1979).

MCF's evidence and the law and meets the applicable standard. While plaintiffs assert that the first and second sentences of the first reason are "an apparent non-sequitor," when the finding is read in the context of the record as a whole, it is evident that it is supported by the requisite quantum of evidence. Town Ex. B, p. 4, 15; MCF Ex. C, p. 32.

Regarding the second reason ("c) The requested use **Will** create undue traffic congestion or unduly impair pedestrian safety"), Ms. Tucker, Ms. Buckley and Ms. Chan all testified that the proposed commercial tower use would disrupt the quiet Bay Road-Jordan Drive neighborhood. This direct testimony describing the particular impact of the proposed tower on the neighborhood also meets the substantial evidence test.

There also is substantial evidence in the record to support the Board's last reason:

> f)    The requested use **Will** impair the integrity or character of the district or adjoining zones, nor be. detrimental to the health, morals or welfare.  Documents presented show that this location may not be the best district to locate the tower, the tower could be place in a better location

In substance, this reason was a finding that there were alternative locations for the proposed tower, particularly the Gun Club in Easton.  The reason is supported by the following evidence. MCF's principal stated why the Gun Club was rejected in favor of Jordan Drive: "the biggest . . . is access. . . The Gun Club access is near the Easton town line and would require a road ascending 150 feet uphill across several wetlands for approximately one mile to get to the site." MCF Ex. E, first page.  MCF therefore rejected the Gun Club, not on the basis that wireless services could not be provided from that location or because the Gun Club was unwilling to have a tower on its property. MCF rejected the Gun Club because development of that location would be more difficult than the Site. MCF Ex. E, first page.  Significantly, Omnipoint admitted that Gun Club would be suitable because it stated, in essence, that it needed a location "at or near the Site." MCF Ex. C, p. 16, ¶18.  Since the Gun Club is near the Site, Omnipoint could operate from there as well as the Site.

12

Additionally, the Board's reason goes to the visual impact of the proposed 190-foot high tower. While the plaintiffs go to great lengths to argue that the tower would not be visible from Jordan Drive or the Bay Road neighborhood, there was direct testimony that the area was particularly "serene," a "landmark" and a "treasure." The Board was entitled to conclude that the testimony of residents was more compelling than the assertions of the tower-building company. Moreover, the photographs submitted by MCF in support of its contention that the tower would not be visible (MCF Ex. E) are virtually illegible and thus cannot depict anything with any degree of certainty.[3]/

Accordingly, the Board acted well within its discretionary authority when it concluded that "this location may not be the best district to locate the tower, the tower could be place in a better location."

C.    Stoughton's Policies And The Board's Decisions Do Not Prohibit The Provision Of Personal Wireless Services.

1.    MCF lacks standing to raise a prohibition claim under the TCA.

The TCA, 47 U.S.C. §332(c)(7)(B)(i)(II), provides:

The regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof – ... shall not prohibit or have the effect of prohibiting the provision of personal wireless services.

Section 332(c)(7)(D), distinguishes between personal wireless <u>services</u> and facilities. Subsection (i) provides: "personal wireless services" are "commercial mobile services, unlicensed wireless services, and common carrier wireless exchange access services;" subsection (ii) provides: "[T]he term 'personal wireless service facilities' means facilities for the provision of personal wireless services."

---

[3]/    See Maxson Aff. ¶¶65-69 for a detailed description of the deficiencies in a July 2004 "balloon test" conducted by MCF. As Mr. Maxson explains, the balloon test did not accurately depict the proposed height of the tower because the balloon was at a height of no more than 130 feet and was not in the same place as where the tower would be.

MCF is not a provider of "personal wireless services." It is a provider of personal wireless "facilities." MCF lacks standing to assert a prohibition claim because the TCA protects the provision of personal wireless <u>services</u>, not the provision of wireless service <u>facilities</u>. <u>Ho-Ho-Kus</u>, 197 F.3d at 71. Moreover, in <u>Amherst, NH</u>, in ruling on the allocation of the burden of proof on the issue, the court held that the "carrier" has the burden and stated, "the burden for a <u>carrier</u> invoking [the prohibition section] is a heavy one." (emphasis added)." 173 F.3d at 14. While in that case the applicant was a carrier, the court's use of the term in the context of the question of whether a permit denial could be a "prohibition" of services is important – only a "carrier" can assert a prohibition claim. Moreover, Chief Judge Young has questioned whether a tower-building company has standing to assert a prohibition claim. See, <u>Tower Resources v. Plymouth</u>, C.A. No. 02-10806-WGY, Memorandum and Order, p. 6, Exhibit A attached hereto ("it is not clear" that the company had standing). While it appears that there are no reported cases that directly address the issue, based on the statutory language, the court should find that MCF does not have standing. Compare, <u>Pelham</u>, 313 F.3d at 635, n.7 (court did not address standing issue but noted that landowner seeking to build tower on property is a "unique plaintiff" because there is no incentive to seek alternative locations).

2.    <u>Omnipoint Has Not Satisfied Its Burden Of Proof That The Board's Decisions Or The Town's Policies Prohibit Personal Wireless Services.</u>

In order for Omnipoint to prevail under the TCA, §332(c)(7)(B)(i)(II), it needs to prove that without the 190-foot high tower at the Site, it will be prohibited from providing personal

wireless services.[4]/ This is a "heavy burden" and the carrier must: "show from language or circumstances not just that *this* application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Amherst, NH, 173 F.3d at 14 (emphasis in original). Similarly:

> It is very difficult for an applicant to argue that denial of a single application effectively establishes an intent to prohibit, or effectively prohibit, the provision of personal wireless services. . . A contrary conclusion "would effectively nullify local authority by mandating approval of all (or nearly all) applicants, a result contrary to the explicit language of Section (B)(iii), which manifestly contemplates the ability of local authorities to 'deny a request.'

National Telecommunication Advisors, LLC v. Board of Selectmen of Town of West Stockbridge, 27 F.Supp.2d 284, 287-88 (D. Mass. 1998) (citations omitted).

Local zoning policies and decisions only have the effect of prohibiting wireless services if the local action results in a "significant gap" in the availability of wireless services. Ho-Ho-Kus, 197 F.3d at 71. A "gap" exists "when a remote user of the services is unable to either connect with the land-based national telephone network, or to maintain a connection capable of supporting a reasonably uninterrupted communication." Id. at 70. Whether a gap exists and whether a gap is significant is a case-by-case determination and "depends not only on its physical size, but also, and perhaps more significantly, upon the number of customers affected by that gap. . . A gap that straddles a heavily traveled commuter thoroughfare would be more significant than a gap that affects a small residential cul-de-sac." Lincoln, 107 F.Supp. at 118-19.

_____

[4]/    The issue of whether a local zoning decision effectively prohibits the provision of personal wireless services is decided *de novo* and is not necessarily limited to the record before the municipal zoning authority. Amherst, NH, 173 F.3d at 17, n. 7. In responding to a motion for summary judgment, the town's "obligation [is] either to show that [the plaintiff's] evidence was factually insufficient, or to come forward with evidence of its own demonstrating a trialworthy dispute." National Tower, LLC v. Frey, 164 F.Supp.2d 185, 190 (D. Mass. 2001), aff'd, National Tower, LLC v. Plainville Zoning Board of Appeals, 297 F.3d 14 (1st Cir. 2002); Fed.R.Civ.P. 56; Amherst, NH, 173 F.3d at 15-16. Here, Stoughton contends that the plaintiffs' evidence is insufficient and also has come forward with its own evidence (the Maxson Aff.) to demonstrate that there is a trialworthy dispute. Stoughton therefore contends that summary judgment should be denied to the plaintiffs and entered for the defendants. Alternatively, Stoughton has demonstrated that there are genuine disputes of material fact.

In Pelham, 313 F.3d at 630, the First Circuit further explained the criteria: "The first is where the town sets or administers criteria which are impossible for any applicant to meet . . . The second involves the situation where the plaintiff's existing application is the only feasible plan." The municipality does not have to prove that other feasible alternative sites exist. Amherst, NH, 173 F.3d at 14. "[The prohibition section of the TCA] does not mean that the denial of a permit for *a particular site* amounts to the denial of *wireless services* because services can be effected from numerous sites in various combinations, sometimes not even within the area to be served." 360° Communications Co. of Charlottesville v. Albemarle County, 211 F.3d. 79, 86 (4th Cir. 2000) (emphasis in original).

When these principles are applied to Omnipoint's evidence, it is clear that the "heavy" burden of proof has not been satisfied.

    a.    <u>Omnipoint has not proven that it has a significant gap in coverage.</u>

First, Omnipoint's computer simulations, "the Coverage Plots" which purport to show the "gap," fail to provide any geographical or political boundaries or other details such as street names. Maxson Aff. ¶37. Without such basic information, it is virtually impossible to understand where the alleged gap is located. Id. ¶36.

Nonetheless, overlooking this fundamental problem, the Coverage Plots do not prove that a gap exists. Id. ¶¶25, 34-36. The Coverage Plots generically describe the area to be covered and do not account for real on-the-ground conditions regarding topography, structures and vegetation. Without such information, the Coverage Plots do not accurately describe existing or projected coverage. Id. ¶¶32-34, 54. A drive test, which would have provided data based on actual conditions, was not conducted. Id. ¶38. The Coverage Plots also are a "gross simplification" of the areas of coverage and non-coverage by showing a "hard transition" between areas of coverage and non-coverage. In fact, such boundaries are not "crisp" and

"[t]here can be reliable coverage in an area that a plot shows not to be covered." Id. ¶34. The Coverage Plots also present a moving target as to where the gap is located. Sometimes the area of alleged inadequate coverage is shown as extending the entire length of Bay Road from the Easton town-line in the south to the Canton town-line in the north. Id. ¶35. Other times the area to be covered is described as "Southeastern Sharon and Southwestern Stoughton." Id. ¶¶48, 50; Exhibit A to Plaintiffs' Motion; Affidavit of Brad Gannon ("Gannon Aff.") ¶¶11-12. Thus, the physical size of the alleged gap cannot be determined.

Also, Omnipoint utterly failed to provide any evidence regarding the "number of customers that would be affected" by the alleged gap. Lincoln, 107 F.Supp.2d at 119. While the Gannon Aff. ¶13, refers to "[t]he high volume of traffic on Bay Road," there is no support for that conclusion. We thus do not know whether or to what extent Bay Road is "a heavily traveled commuter thoroughfare" (although we do know that Jordan Drive is a cul-de-sac, id. ¶17). Such omissions, when coupled with the vague and inconsistent descriptions of the "gap," cannot satisfy the "heavy burden" the TCA requires to prove that there is a gap in coverage and if so, that the gap is significant. Maxson Aff. ¶52.

The record also is devoid of any evidence that a 190-foot high tower is necessary to fill a gap. While Mr. Gannon asserts, Aff. ¶4, that there are "expressions of interest" from other carriers, such "expressions" plainly cannot come close to meeting the heavy burden under the TCA. And, even if there is a gap, a much lower tower could be adequate to serve Omnipoint. Indeed, Omnipoint does not assert that it needs any particular height to meet its coverage objectives and has failed to provide evidence regarding whether and to what extent coverage could be provided at a lower height. Maxson Aff. ¶¶40-44. Without such evidence, it is not possible to evaluate the need for a particular tower height, much less one that is 190-foot high.

b.    Omnipoint has not proven that there are no alternative feasible sites.

Omnipoint also has failed to prove that there are no other available locations for the tower by demonstrating that the existing application is the only feasible plan. Indeed, Omnipoint does not even contend that the Site is the only feasible alternative. It is MCF that is pushing the Site (a location "at or near Jordan Drive" would do for Omnipoint). MCF Ex. C, p. 16, ¶18. Therefore, Omnipoint has conceded that alternatives exist.

Such alternatives include the Sharon Country Club and the Gun Club. The Country Club was summarily eliminated by Mr. Gannon, who is not a radio frequency engineer, despite the fact that a tower was recently approved there, and the location could "cover" the northern area of Bay Road, at least. Maxson Aff. ¶¶47-48. Apparently, Mr. Gannon as the representative of a tower-building company had no incentive to consider a site where another company already had a tower. Additionally, an application is pending for a Simpson Street site in Stoughton that "would have a dramatic effect on the alleged gap along Bay Road." Maxson Aff. ¶46. Simpson Street is not even mentioned; again presumably because MCF is not interested in providing personal wireless services, but only in building a tower.

Regarding the Gun Club, that location was eliminated by Mr. Gannon (but not by Omnipoint), not because it could not provide coverage, but for reasons that development would be more costly and complex than the Site. However, no cost estimates were provided regarding development and as demonstrated below, the typical return on a tower would more than compensate for any costs. Maxson Aff. ¶62. The Gun Club therefore is a viable alternative site. Id. ¶¶59-61, 63. MCF's cursory search of alternative sites is typical of a tower-building company seeking the easy way out. Id. ¶¶58, 64. As Mr. Maxson states: "The low-hanging fruit is picked." Id. ¶58. Such an approach is not the legal equivalent of rendering other locations unfeasible or that further efforts to find a location acceptable to a municipality would be futile.

In attempting to support the contention that the Town's policies prohibit the provision of personal wireless services, MCF relies on the fact that the Zoning By-law limits a lot to one principal use and that the alleged cost of acquiring a buildable lot "renders it patently unfeasible to pursue such a project." Gannon Aff. ¶28. This argument is without merit for several reasons. First, ignoring MCF's overblown rhetoric, there is no evidence, other than Mr. Gannon's hearsay and unsupported assertion, regarding the market value of a buildable lot in the neighborhood. Gannon Aff. ¶27. Second, since the potential annual revenue from a 190-foot high tower would be a minimum of $144,000 and could be up to $216,000 (Maxson Aff. ¶62), even if the acquisition costs were in the range of $175,000 to $300,000, such costs would be recouped at the most within the first two years. Finally, there is no evidence that further efforts to locate a tower in the Town would be futile, which is the applicable legal standard. There is no evidence that the Board or the Town has any history of hostility to towers or providers of personal wireless services and there is no evidence that either entity has taken any action regarding wireless services in Stoughton that would even remotely support such a contention.

While MCF may think that its proposal for the Site is the best way to provide coverage, the courts have held that "subject to an outer limit, such choices are just what Congress has reserved to the town." Amherst, NH, 173 F.3d at 15; Aegerter v. City of Delafield, Wisc., 174 F.3d 886, 891-92 (7th Cir. 1999) ("it is not [the] job [of the federal court] to second-guess" Congress' decision to allow a municipality to determine where towers should be placed).

Here, MCF/Omnipoint has not sought approval for any location other than the Site – they cavalierly have excluded possible alternatives. They therefore have failed to sustain the burden of proof that "further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." Amherst, NH, 173 F.3d at 14. When all of the plaintiffs' evidence in support of their prohibition claim is evaluated, it is clear that a 190-foot high tower at the Site is being driven by

19

MCF's business concerns and not by Omnipoint's coverage needs. As a tower-building company, MCF has chosen the easiest location to develop. However, under the TCA, such business concerns are not protected. Amherst, NH, 173 F.3d at 15.

The TCA's "outer limit" of local regulation is not reached here because Omnipoint cannot prove that its plan is the only feasible plan. Id. There plainly are less intrusive alternatives. If the court rules otherwise and allows a 190-foot high tower to be installed in a quiet residential neighborhood in violation of the Town's Zoning By-law without evidence that that height is needed by a provider of personal wireless services, the court would eviscerate the discretion that the TCA specifically confers on municipalities to regulate the placement of wireless facilities.

## CONCLUSION

The Court should deny plaintiffs' motion for summary judgment and enter judgment as a matter of law on behalf of Stoughton affirming the decisions of the Zoning Board of Appeals. In the alternative, the Court should deny summary judgment because a genuine dispute of material fact exists regarding whether the decisions have the effect of prohibiting the provision of personal wireless services.

TOWN OF STOUGHTON, ET AL.,

By their attorneys,

**CERTIFICATE OF SERVICE**
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on _July 24, 2004_

Brian W. Riley (BBO# 555385)
Patricia A. Cantor (BBO# 072380)
Kopelman and Paige, P.C.
   Town Counsel
31 St. James Avenue
Boston, MA 02116
(617) 556-0007

229957/60700/0524

**EXHIBIT A**

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

```
                              )
TOWER RESOURCES, INC.,        )
                              )
        Plaintiff,            )
                              )
        v.                    )    CIVIL ACTION
                              )    NO. 02-10806-WGY
A. WENDY LONGO, JEAN LOEWENBERG, )
KAREN L. RICHCREEK, PAUL      )
McAULIFFE, and PETER CONNOR, as )
they are the members of the Town )
of Plymouth Zoning Board of   )
Appeals, and THE TOWN OF      )
PLYMOUTH ZONING BOARD OF      )
APPEALS, to the extent that they )
are a board subject to suit   )
under a common name, and the  )
TOWN OF PLYMOUTH,             )
                              )
        Defendants.           )
                              )
```

### MEMORANDUM AND ORDER

YOUNG, C.J.                                      March 31, 2003

The plaintiff, Tower Resources, Inc. ("Tower"), is the
lessee of real estate located at 532 Federal Furnace Road in
Plymouth, Massachusetts.  Pl.'s 56.1 Stmt., ¶ 3.  This parcel of
real estate consists of approximately 4.3 acres located in
Plymouth's Rural Residence zoning district; it abuts Kings Pond
and several residential neighborhoods.  Id.; see also Defs.' 56.1
Stmt., ¶ B2.  On November 8, 2001, Tower and Sprint Spectrum L.P.
("Sprint"), a wireless communication services provider, filed an
application for a Special Permit with Plymouth's Zoning Board of

**DOCKETED**                                    41

Appeals to construct a wireless communications facility (namely, a 150 foot monopole) on the above-described property.  Id. at ¶¶ 4-5.  A special permit was required for the construction of this facility was required because its proposed height well exceeded 35 feet.[1]   The Zoning Board of Appeals conducted hearings and ultimately denied the application, voting unanimously against it on April 3, 2002, and issuing a written decision regarding the denial on April 16, 2002.  Id. at ¶¶ 8-9; see also Affidavit of Margaret Ishihara, Ex. A, 212-228.

Tower subsequently brought the instant complaint under the Telecommunications Act of 1996, 47 U.S.C. § 332 et. seq., against the Town of Plymouth Zoning Board of Appeals ("the Zoning Board"), its members, and the Town of Plymouth (collectively, "the Defendants").  Tower alleges (1) that the Zoning Board's denial of the requested permit was not supported by substantial evidence, as required by the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(iii), and (2) that the Zoning Board's denial of the

---

[1] The Town of Plymouth Zoning Bylaws provide that:
No structure shall be built, constructed, erected, or added to above a height of thirty-five (35) feet;...without a special permit from the Board of Appeals, after a finding by the Board that there is no feasible alternative to the proposed height, that it is the minimum necessary, that there is a clear and specific public benefit which may be realized only by exceeding 35' in height, and that the proposed structure will not in any way detract from the visual character or qualify of the adjacent buildings, the neighborhood or the Town as a whole.

Plymouth Zoning Bylaws, § 300.09

permit constitutes an effective prohibition of personal wireless services, in violation of the Telecommunications Act, 47 U.S.C. § 332(c)(7)(B)(i)(II).  Compl. ¶¶ 13-14.  Tower asks this Court to issue an injunction ordering the Zoning Board to issue the permit in question.

Both Tower and the Defendants have moved for summary judgment.  On March 26, 2002, this Court held a hearing on the parties' cross-motions for summary judgment.  At that hearing, the Court granted summary judgment to the Defendants on Tower's claim that the denial was not supported by substantial evidence. The Court took under advisement the parties' cross-motions in regard to Tower's "effective prohibition" claim.  The Court now proceeds to address that claim.

As noted above, both parties have moved for summary judgment.  Summary judgment is appropriate only when the "the pleadings, depositions, answers to interrogatories, and admissions of file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c).  The court "must view the entire record in the light most hospitable to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Griggs-Ryan v. Smith, 904 F.2d 112, 115 (1st Cir. 1990).  As the First Circuit has explained, "Cross-motions for summary judgment

3

do not alter the basic Rule 56 standard, but rather simply require us to determine whether either of the parties deserves judgment as a matter of law on facts that are not disputed." Adria Int'l Group, Inc. v. Ferre Development, Inc., 241 F.3d 103, 107 (1st Cir. 2001). Thus, a genuine dispute of material fact prevents a court from granting summary judgment to either side when faced with cross-motions for summary judgment. That being said, "[g]enuine issues of material fact are not the stuff of an opposing party's dreams." Mesnick v. General Electric Co., 950 F.2d 816, 822 (1st Cir. 1991). As the Mesnick court explained, "[n]ot every discrepancy in the proof is enough to forestall a properly supported motion for summary judgment. . . . On issues where the nonmovant bears the ultimate burden of proof, he must present definite, competent evidence to rebut the motion."

It is Tower that bears the burden of proof on its effective prohibition claim. The Telecommunications Act provides that "[t]he regulation of the placement, construction, and modification of personal wireless service facilities by any State or local government or instrumentality thereof-- . . . shall not prohibit or have the effect of prohibiting the provision of personal wireless services." 47 U.S.C. § 332(c)(7)(B)(i)(II) (emphasis added). As the First Circuit explained in Second Generation Properties, L.P. v. Town of Pelham, "In invoking the effective prohibition language, the burden for the carrier. . .

4

is a heavy one: to show from language or circumstances not just that this application has been rejected but that further reasonable efforts are so likely to be fruitless that it is a waste of time even to try." 313 F.3d 620, 629 (1st Cir. 2002) (internal citations and quotation marks omitted). In this inquiry, courts often begin with the starting point of whether there is in fact a significant gap in cell phone coverage in the town in the first place. See, e.g., id. at 631; Omnipoint Holdings v. Town of Westford, 206 F. Supp. 2d 166, 170 (D. Mass. 2002) (Tauro, J.).[2] Once it is established that there is a significant gap in the particular provider's services, two sets of circumstances can be seen as setting forth an effective prohibition: (1) "where the town sets or administers criteria which are impossible for any applicant to meet"; or (2) "where the plaintiff's existing application is the only feasible plan; in that case, denial of the plaintiff's application might amount

---

[2]This, of course, raises a question: is the relevant inquiry whether there is no coverage at all in the geographic gap area, or whether there is no coverage for a particular provider's services in the area (even though one or more other providers are represented)? The First Circuit has suggested that it may be the latter, given the Telecommunication Act's emphasis on promoting competition among wireless providers. Second Generation, 313 F.3d at 633-34. For the purposes of the instant cross-motions, the Court considers the question to be whether there is a significant gap in Sprint's services, not whether there is a significant gap in all cell phone service in the particular area of Plymouth at issue.

to prohibiting personal wireless service." Second Generation, 313 F.3d at 630 (internal citations and quotation marks omitted).

As an initial matter, the Court notes that it is not clear that Tower has standing to bring this claim.  The Defendants have pointed out that, subsequent to the denial of the application brought by Tower and Sprint for the Federal Furnace Road site, the Zoning Board of Appeals granted Sprint a permit to construct a wireless communications facility at another site in Plymouth: a water tank at 40 Lantern Lane.  Defendants' Mem. in Opp'n to Summ. J. and in Supp. of Cross-Mot. for Summ. J. ("Defs.' Mem.") at 5-6.  According to the Defendants, the coverage provided by that facility is largely duplicative of the coverage that would have been provided by the Federal Furnace Road.  Id. at 6; Aff. of David P. Maxson, ¶ 41.  Sprint has not joined in Tower's lawsuit against the Defendants, and it is not clear that, even if this Court were to issue an injunction ordering the Zoning Board to grant the permit formerly requested by Tower and Sprint, Sprint would in fact pursue the construction of the monopole or locate on the site.  In other words, it is not clear that if this Court issued the requested relief, Tower's alleged injury would be redressed.  As the Supreme Court has made clear, redressability is a requirement for standing.  See, e.g., United States v. Hays, 515 U.S. 737, 742-43 (1995) (stating that for standing to be established, it "must be likely, as opposed to

merely speculative, that the injury will be redressed by a favorable decision") (internal citations and quotation marks omitted).

Even assuming that Tower does have standing to bring this action, it has not satisfied its burden to survive summary judgment. In response to the Defendants' claim to the contrary, Tower has not set forth definite, competent evidence to show that -- now that the Zoning Board has granted Sprint a permit for the Lantern Lane site -- there remains a significant gap in coverage in Sprint service. The only one of Tower's pleadings even to acknowledge the existence of the Lantern Lane site is the supplemental affidavit of Barbara Deighton, Tower's president. In her affidavit, Deighton states merely that she has reviewed the coverage map for the Lantern Lane site, Deighton Supplemental Aff. at ¶ 5, and attaches a map apparently showing that Tower's proposed site and the Lantern Lane site are approximately three miles apart, id. at Ex. B. Even Deighton herself does not attest that a significant gap in Sprint coverage still exist.

Moreover, even had Tower adduced definite, competent evidence that a significant gap in Sprint coverage still exists, Tower's effective prohibition claim would fail. Tower has not shown that further reasonable efforts to fill that gap are so likely to be fruitless that it is unnecessary even to try, either because the Zoning Board's regulations are impossible for any

7

carrier to meet or because Tower's existing application is the only feasible means of filling the gap in Sprint services. Any argument that the Zoning Board's regulations are impossible to meet is belied by the Zoning Board's approval of numerous wireless facilities, including, of course, the Lantern Lane site. See Aff. of Assistant Town Manager Mark D. Sylvia at ¶ 8. Moreover, Tower has produced no definite, competent evidence -- indeed, no evidence whatsoever -- that, in light of the Lantern Lane site's contribution to Sprint services, any remaining gap that allegedly exists can be resolved only by the construction of a 150 foot monopole at the Federal Furnace Road site.[3]

Accordingly, Tower's motion for summary judgment [Docket No. 24] is DENIED, and the Defendants' motion for summary judgment [Docket No. 31] is GRANTED.

SO ORDERED.

WILLIAM G. YOUNG
CHIEF JUDGE

---

[3]The Court notes that even prior to the existence of the Lantern Lane site, Tower apparently conceded that the 150-foot monopole was not the only way to fill the gap, in that it agreed to a compromise height of approximately 130 feet when the proposal was pending before the Zoning Board. Pl.'s Mem. for Summ. J. at 4. Tower nonetheless now asks this Court to order the Zoning Board to grant a permit for a monopole of the original 150 foot height. Id.