UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

FILED
CLERKS OFFICE

C.A. NO. 03CV12517-MEL

2004 SEP 24  P 4: 16

U.S. DISTRICT COURT
DISTRICT OF MASS.

MFC COMMUNICATIONS, INC. and OMNIPOINT
HOLDINGS, INCORPORATED,

        Plaintiffs

v.

THE TOWN OF STOUGHTON, THE TOWN OF
STOUGHTON ZONING BOARD OF APPEALS, and
ALLAN R. KATZ, EDWARD F. COPPINGER,
ORLANDO DiGIAMPIETRO, HERBERT MUSMON,
STEVEN D. MITCHELL, and WILLIAM FRANCIS,
individually and as they are members of the
STOUGHTON ZONING BOARD OF APPEALS,

        Defendants

AFFIDAVIT OF DAVID P. MAXSON

I, David P. Maxson, hereby say that the following is true based on my personal

knowledge and experience:

## PERSONAL BACKGROUND AND CREDENTIALS

1.    I am an adult citizen of the United States.  I co-founded Broadcast Signal Lab in 1982

and since then have been a Managing Partner and Principal Engineer of this engineering

firm which has a principal place of business at 64 Richdale Avenue, Cambridge,

Massachusetts, 02140.

2.    I have been a member of the Town of Medfield Wireless Committee since its inception in

1996.  In that time, several wireless bylaw modifications have been adopted, a wireless

tower constructed, and municipal leasing of the Town water tank to three wireless
carriers has occurred as a result of the Committee's actions.

3.    I hold a Massachusetts Construction Supervisor License, number CS-073481, which
recognizes my familiarity with Massachusetts Building Code and entitles me to supervise
construction of structures up to 35,000 cubic feet volume.

4.    I hold a Bachelor of Science degree in Broadcasting from Boston University.

5.    From 1978 to 1998, I was employed by Charles River Broadcasting Company, Waltham,
Massachusetts, where I served as Vice President, Director of Engineering.  At both
Charles River Broadcasting and my own business I have been responsible for all facets of
communications tower occupancy, including being a tenant, a manager/landlord, and a
builder of towers.

6.    I have extensive experience in the field of radio frequency engineering, including
designing, installing, maintaining, and upgrading radio frequency transmission and
reception facilities, performing signal coverage and interference analysis, preparing radio
frequency allocations engineering for facilities licensed by the Federal Communications
Commission ("FCC"), designing and implementing programs and procedures to ensure
radio frequency facilities are in compliance with technical regulations and standards, and
performing field measurements and analysis of radio frequency signals.

7.    I am currently under contract with the Cape Cod Commission, and several Massachusetts
municipalities to provide analysis and recommendations regarding the placement and
permitting of wireless communications facilities.  In the past decade I have performed
over one hundred such consultations with municipalities in five of the six New England
states.

2

8.  I am a member of the Institute of Electrical and Electronics Engineers, and a member of the Society of Broadcast Engineers from which I have earned Certified Broadcast Radio Engineer certification.

9.  I have testified as an expert witness in both federal and state court cases on matters of wireless communications facilities siting, including testimony in Omnipoint Communications v. the Town of Lincoln, Massachusetts, AT&T Wireless PCS, LLC vs. the Town of Concord, Massachusetts, and SBA Tower v. the Town of Kingston, NH, among others.

10. The Commonwealth of Massachusetts Office of Business and Consumer Affairs has qualified me as a wireless mediator and engineering expert to assist parties seeking the Office's assistance in resolving wireless disputes.

11. I was one of three experts in radio frequency energy safety who were appointed by the Commonwealth of Massachusetts in 1997 as an ad hoc committee to review and recommend changes to the Commonwealth of Massachusetts Department of Public Health Non-ionizing Radiation safety regulations (105 CMR 122.000 *et seq*).

12. I authored and presented technical papers on radio frequency communications technology at radio engineering technical conferences, including topics on digital signal transmission measurement techniques, receiver susceptibility to interference, and a proposed data protocol for broadcasting digital information over the airwaves.

13. I am a member of the National Radio Systems Committee's Digital Audio Broadcasting Subcommittee, which is developing standards that will eventually establish a digital radio broadcasting service in the USA. As a member of the Subcommittee's System Evaluation Working Group, I was principal author of major portions of its system test

evaluation guidelines and two subsequent system test evaluation documents. The National Radio Systems Committee is sponsored jointly by the Consumer Electronics Association and the National Association of Broadcasters to promote the development of standards and recommendations that promote beneficial uses of the radio spectrum.

14. Under my supervision, Broadcast Signal Lab performed an analysis of contemporary models of radio receivers to determine their susceptibility to certain kinds of interference. I wrote the report on this analysis, which was entered into the public record by my clients in an FCC Notice of Proposed Rulemaking in the matter of Creation of a Low Power Radio Service, Mass Media Bureau Docket #99-25. I presented a technical paper on the subject to the National Association of Broadcasters Engineering Conference and testified before the US House Commerce Committee, Telecommunications Subcommittee on the matter in 1999.

15. In the past year I was the project manager and lead engineer of a team of radio frequency specialists that executed a public health study commissioned by the US Air Force regarding public exposure to the emissions of the PAVE PAWS radar on the Massachusetts Military Reservation. I developed and validated a propagation model of the radar's UHF emissions. That model is being employed by an epidemiologist to study whether there are any associations between disease rates and public exposure to the radar emissions. The study also involved, under my direct supervision, field measurement of radio frequency emissions to a high degree of accuracy. A citizen steering group composed of public health officials on Cape Cod is directing the process, and the results of the study have been made public and submitted to the National Academy of Sciences for incorporation into their Congressionally mandated review.

4

16. I am familiar with portions of the Federal Telecommunications Act of 1996 ("TCA") and have advised governmental entities, wireless communications companies, and other parties regarding compliance with provisions of the statute and its subsequent implementations by the FCC.

17. I am familiar with FCC rules regarding personal communications services under which Omnipoint Holdings, Incorporated ("Omnipoint") is licensed to operate.

18. I am aware that the TCA does not preempt local zoning as long as the local zoning does not prohibit or have the effect of prohibiting the provision of personal wireless services, does not unreasonably discriminate among providers of functionally equivalent services, and does not regulate placement of personal wireless facilities on the basis of environmental effects of the radio frequency emissions to the extent that they comply with FCC emissions regulations.

19. I have assisted many municipalities in the drafting of bylaws and ordinances that enable compliance with TCA requirements and in the review of proposed facilities subsequently regulated under such bylaws and ordinances.

20. I have assisted many municipalities in the execution of requests for proposals to site wireless facilities on municipal property and am thereby involved in bid review and lease negotiations with wireless carriers.

### DOCUMENTS AND EVIDENCE RELATED TO THIS CASE

21. I have, among other documents, read relevant parts of the Town of Stoughton Zoning Bylaws, and specific documents provided to me by counsel for Stoughton. These documents include the following:

    (a)    Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion")

(b)     Memorandum in Support of Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Memorandum") and supporting documents including:

(c)     Affidavit of Bradford Gannon in Support of Plaintiffs' Motion for Summary Judgment (" Gannon Affidavit"), attached as Exhibit A to Plaintiffs' Motion.

(d)     Zoning Board of Appeals Application for Grant of Special Permit, MCF Communications, Inc, Petitioner, including, among others, a Project Narrative Description (Plaintiffs' Motion, Exhibit C, pp. 11,12); various plans and photographs; computer-estimated coverage plots (Plaintiffs' Motion, Exhibit C, pp. 18, 19, "Coverage Plots" which are duplicated on pp. 65, 66); Statement of Support for Special Permit/Variance Approval, by Omnipoint (Plaintiffs' Motion, Exhibit C, pp. 55-57); Affidavit of Radio Frequency Experts Anna Adkins and Richard Kala (Plaintiffs' Motion, Exhibit C, pp. 13-17, "RF Affidavit," which is duplicated on pp. 60-64).

22.    I have toured the neighborhood of the proposed facility by automobile, and personally visited the proposed tower site, 76 Jordan Drive, off of Bay Road in Stoughton on July 10, 2004, when MCF conducted a "balloon test."

23.    I have examined the two Coverage Plots, provided to MCF by Omnipoint that are part of the record in the litigation.

## SUMMARY OF OPINIONS

24.    In summary, based on my review of the foregoing information and on my experience as a wireless technology consultant, radio frequency engineer, and construction supervisor, it is my opinion that the denial of permits for the proposed 190-foot-high wireless tower at

76 Jordan Drive, Stoughton, Massachusetts does not prohibit the provision of wireless service.

25. The reasons for this opinion include: (a) the evidence purporting to show a "gap" in coverage for any personal wireless service provider does not show such a gap; and (b) no evidence was submitted to show that the gap, if any, is significant. Additionally, there appear to be alternative means of providing coverage in the target area, regardless of the extent of a gap, if any.

26. I also conclude that the balloon test I witnessed on July 10, 2004 failed to depict the actual height of the proposed facility due to insufficient length of the balloon tether.

27. It is therefore my opinion that the balloon test did not accurately depict the likely visual impact of the proposed 190-foot tower.

28. Finally, I conclude that in the event there is a significant gap in coverage in the area of the proposed facility, such a gap would be (a) smaller than shown in the Omnipoint computer-estimated Coverage Plots, and would be (b) capable of being served from other viable parcels.

COVERAGE ANALYSIS

29. I am familiar with the type of Coverage Plots provided by Omnipoint, having reviewed similar ones in other wireless facility siting matters involving Omnipoint.

30. Coverage plots utilize computer software and geographic information databases to estimate the coverage provided by existing and proposed facilities. No computer model is 100% correct at each point on the ground depicted on a plot. This is due to the statistical nature of modeling radio signal propagation. Therefore, such plots can be useful guides, but the exactitude of the predicted signal at any given point on the map is

statistically dependent on the error distribution of the model, often reported in terms of the accuracy of the mean or median value and the standard deviation of the error. When considering the fine structure of a plot, such as where a small gap is shown or where a small overlap is shown between the coverage of two facilities, the computer estimations may not be sufficient to answer the question "will the service work here?" due to the errors and uncertainties of the prediction.

31.    In a general way, computer-estimated plots provide a broad indication of where coverage exists and does not exist. However, such plots are interpretations of coverage based on a number of assumptions about what constitutes acceptable coverage and what the impact of the environment is on the coverage in the region depicted in the plots. Even reputable coverage estimates vary among those who execute them and among the various software packages and settings employed to make the plots.

32.    For instance, radio signals are affected by the vegetation and structures on the ground, often referred to as "clutter," and computer models have different ways of accounting for the effect of clutter. The Omnipoint plots are derived using only a generic regional estimation of signal losses due to clutter that is applied equally to the entire map. A more precise method is to employ a land use/land clutter database that changes the signal loss estimate for each point on the map based on the characteristics of the clutter at that point. With more resolution to the clutter estimations, the accuracy of a coverage plot is improved. Clutter databases are frequently used in wireless coverage estimation.

33.    I infer that the Omnipoint model uses the generic map-wide clutter estimate because, the RFAffidavit, ¶13 (Exhibit C to Plaintiffs' Motion, pp. 60-64), states that the affiants used the generic "suburban" model for their analysis. Not only is this less precise because it

applies equally to all points on the plot, but also the choice of the suburban model may not be the most accurate. This is due to the fact that the suburban clutter algorithm, particularly in the commonly-used Okumura-Hata propagation model, relies on what is considered in Japan to be suburban clutter. Such clutter is far more urban in nature than the wooded Stoughton terrain with homes on 1-acre-or-greater lots which characterizes the neighborhood around the proposed tower.

34.    There is a gross simplification inherent in the Coverage Plots because they depict a hard transition between the colored region on the plot and the white region on the same plot when in reality no such hard transition exists. See the regions of dark gray and white on the Coverage Plots, Plaintiffs' Exhibit C, pp. 18-19. This black-and-white approach is often intended to show the boundary between coverage and no coverage, when in fact the boundary in the real environment is not so crisp. Coupling the overstated crisp boundary depicted on the plots with the inherent variability in the accuracy of the plots, it is clear that such plots cannot be taken literally. There can be reliable coverage in an area that a plot shows not to be covered.

35.    Based on the Omnipoint computer-estimated Coverage Plot "Coverage without 4BS0549E MCF @ 160' " (Plaintiffs' Exhibit C, p. 18), the layperson might get the impression that there is a large geographic area presumably along Bay Road, which runs along the Stoughton/Sharon boundary, that has no Omnipoint service. The white area representing Omnipoint's interpretation of inadequate coverage appears to extend along this road from the Easton boundary in the south about four miles northward, nearly all the way to the Canton boundary. The companion Plot, "Coverage with 4BS0549E MCF @

9

160' " (p. 19) suggests the MCF facility would enable Omnipoint to fill this area with
signal.

36.    Because of the variability of the accuracy of the Coverage Plots, two misinterpretations
are possible. First, the actual coverage from the existing facilities depicted may be
greater (or less) than that shown on the plots. Second, the actual coverage to be obtained
from the proposed facility may be less (or more) than shown on the plot. Consequently,
it is not possible based on the evidence provided to determine the size of the alleged gap,
and the degree to which the proposed facility would serve it.

37.    The Coverage Plots suffer additional problems due to their lack of geographic details,
such as political boundaries and street names, to name two. Such information serves to
eliminate ambiguity in interpreting the coverage plots and underlying maps. My
statements in this Affidavit regarding street names, political boundaries, and extents of
alleged coverage and alleged gaps are based upon my knowledge of the area, other
information in the record, and assumptions about the Coverage Plots.

38.    It is often appropriate to conduct field measurements of the existing signal levels to be
more certain of the region in which new coverage is or is not necessary, and to conduct
field measurements of a test signal emitted from the proposed locations be more certain
they will perform as desired. Omnipoint agrees when it states in the RF Affidavit ¶10
(Exhibit C, p. 14-15): "Drive tests, using transmitters set up at the proposed locations...,
may also be performed to validate the results of the computer simulations." If there is a
gap, it may turn out to be substantially smaller than the one depicted by the computer-
estimated plots. A smaller gap would allow a shorter tower or other installation at the
same or a different location, or obviate the need for a new tower altogether. Omnipoint

makes no assertion that it has performed a drive test of the proposed site and antenna height.

## ANTENNA AND TOWER HEIGHT

39.    Without more precise coverage information, it is impossible to determine reliably if having a tower in the area is necessary, or if necessary, if it is taller than necessary.

40.    A tower is too tall when sufficient coverage can be provided from a lesser height. Indeed, Omnipoint says in the RF Affidavit ¶17 (Exhibit C, p. 16) that it shows "the coverage that would be achieved" with plots simulating a 160-foot antenna height above ground, but makes no assertion that this height is necessary to provide the coverage it seeks. Omnipoint also provides no evidence regarding any greater height than 160 feet, including the 190-foot height of the proposed tower. Indeed, the MCF plans, Plaintiffs' Exhibit C, pp. 25, 42, show Omnipoint antennas at the nominal 160-foot height, 30 feet below the top of the proposed tower.

41.    In the RF Affidavit, Plaintiffs' Motion Exhibit C ¶18, p. 16, Omnipoint only asserts it needs the general location without specifying any particular minimum height, stating: "without a WCF [Wireless Communications Facility] at or near the [Jordan Drive] Site [emphasis added], there will be a significant gap in T-Mobile's... coverage."

42.    It is quite possible that an antenna height of 80 feet above ground, or some other height substantially less than 160 feet could be sufficient height to provide Omnipoint the coverage that it says it needs. If so, then the proposed 190-foot tower would be unnecessarily high for Omnipoint by potentially 110 feet.

43.    The claim of a need for the 190-foot height of the tower, or any other height, for the provision of wireless service has not been supported by rigorous measurements of

existing coverage along with measurements of test signals from the proposed site *at
various heights* to demonstrate both the need for coverage and the minimum height
impact necessary to fulfill the need.

44.    In short, demonstrating a need for a particular tower at a particular location and height is
a very different matter than demonstrating a need for the general provision of service in a
given area.  Even assuming a coverage gap of some size exists, a particular tower on a
particular parcel at a particular height must be shown to be the only solution to serve the
gap before its non-approval is prohibitive of service.  Based on the evidence in this case,
Omnipoint has not demonstrated that it needs the 160-foot height, let alone the proposed
190-foot tower.  MCF, a tower-building company is pushing the 190-foot height.

### POTENTIAL ALTERNATIVE SITES

45.    In addition to the uncertainty of the Coverage Plots regarding gaps, coverage areas and
antenna heights, the Omnipoint plots do not show potential coverage from other approved
and actively pursued wireless facility sites in Stoughton and Sharon.

46.    One such site is located at 125 Simpson Street in West Stoughton.  This site is
significantly closer to a substantial portion of Bay Road than the existing Stoughton
wireless site shown near Route 138 on the Omnipoint plots and the proposed Jordan
Drive site.  It is my understanding that this site presently has a communications tower and
that there is an  application hearing in progress before the Stoughton Board of Appeals to
allow a wireless telecommunications carrier to install a wireless facility on the tower.
Utilization of the Simpson Street location by Omnipoint would have a dramatic effect on
the alleged gap along Bay Road.

47.    Similarly, recent activity by Sprint at the Sharon Country Club has resulted in the approval of a tower on their golf course. This is another location from which Omnipoint could reduce or eliminate the alleged gap, yet this has been presented by MCF as a non-option.

48.    In the Gannon Affidavit, Plantiffs' Motion, Exhibit A. ¶12, Mr. Gannon asserts: "Based upon the RF plots and subsequent discussions with the carriers, I learned that even if that facility [at Sharon Country Club] was permitted by the Town of Sharon, it would still not cover the residents of Southeastern Sharon or Southwestern Stoughton." I infer from this statement that the Sharon Country Club Facility could "cover" residents farther north. It is the only way to reconcile this statement with other statements about coverage needs, because the Bay Road coverage objective encompasses a much greater area to the north than the region described as Southeastern Sharon and Southwestern Stoughton. However, parts of the expressed rationale for choosing Jordan Drive are not supported by other evidence in the record.

49.    First, in discussing the alleged coverage needs along Bay Road, ¶13 of the Gannon Affidavit refers without any basis to "the high traffic volume on Bay Road." There is no evidence regarding the level of traffic on the road, nor any evidence of what constitutes "high volume."

50.    Second, the area of the proposed coverage is inconsistently described. The coverage objective is either large or small, according to paragraphs 12 and 13 of the Gannon Affidavit. Mr. Gannon refers, in ¶13, to traffic "on Bay Road" as a "significant coverage priority." Bay Road travels through a substantially greater area than just "Southwestern Sharon or Southwestern Stoughton" as highlighted in ¶12. The RF Affidavit, Plaintiffs'

13

Motion Exhibit C ¶8, p. 14, also states the coverage objective as Bay Road, not a
particular portion of it: "…to provide adequate coverage to the Town of Stoughton along
Bay Road." The RF Affidavit ¶15, p. 15, echoes this statement when it alleges:
"inadequate coverage along Bay Road and the neighboring area. In ¶18 (p. 16), the
coverage objective is "the citizens of Stoughton and commuters traveling through the
Town." The only coverage evidence submitted and discussed in detail was Omnipoint's
white area along nearly the entire length of Bay Road based only on currently-operating
Omnipoint facility sites.

51.    The statement about the Sharon Country Club facility indicates a shift from proposing a
tower anywhere along Bay Road that would serve Bay Road to proposing a tower only in
the southern third of the Bay Road area. Mr. Gannon narrows the area to locate the MCF
facility "to parcels south of the Bay/Highland Road split." (Gannon Affidavit, Plaintiffs'
Motion Exhibit A ¶15, p. 4) Based on my review of the coverage plots and my
familiarity with the area, only about one third of Bay Road is south of the intersection
with Highland Road. Mr. Gannon's rationale for narrowing the scope of his parcel
search to this substantially smaller area is based "on those [unidentified] RF studies and
the topography surrounding Bay Road." (*Id.*)

52.    Based on the foregoing, MFC and Omnipoint have not shown the impact of other known
options on the alleged need for a 190-foot tower at 76 Jordan Drive, and have failed to
substantiate that the alleged gap is significant.

53.    At the same time that MCF asserts it is seeking to fulfill a need for service in the
southwestern portion of Stoughton, Omnipoint's Coverage Plots and the assertions in the
RF Affidavit about Bay Road indicate that the Jordan Drive facility is designed to serve

14

more than just Southeastern Sharon and Southwestern Stoughton residents. An antenna
at 160 feet in height would reach well north into territory that is not limited to Southeast
Sharon or Southwest Stoughton.

54.     Another discrepancy in the assertion about the alleged inadequacy of the Sharon Country
        Club wireless facility is simply that Mr. Gannon, a site acquisition consultant, is making
        conclusions about the coverage needs of Omnipoint and other wireless carriers based on
        his readings of unidentified "RF plots" and "discussions" with unnamed parties.  In
        addition to providing no studies other than Omnipoint's as evidence of coverage, no
        evidence is submitted regarding the "topography surrounding Bay Road." Therefore any
        topographical reason for reducing the search area is unsubstantiated. This reduction in
        the search area may have artificially limited the potential parcels available for siting
        wireless facilities.

55.     As a site acquisition consultant, Mr. Gannon negotiates the siting of potential wireless
        facilities. In this respect he states he is "familiar in extensive detail with… radio
        frequency… issues [among others] that go into the successful permitting and leasing of a
        wireless telecommunications facility." (Gannon Affidavit, Plaintiff's Motion, Exhibit A,
        ¶2)

56.     However, Mr. Gannon's "extensive" familiarity with radio frequency issues is exposed
        by some erroneous assertions by the plaintiff in the Plaintiffs' Memorandum (Section B.,
        beginning on p.3) which are taken directly from the Gannon Affidavit (¶6). Omnipoint's
        GSM technology is not an "offshoot" of CDMA technology as the Plaintiffs'
        Memorandum states, but a competing technology employed by other carriers. GSM and
        CDMA are fundamentally different technologies. Each wireless technology has strengths

and weaknesses that affect the prediction and interpretation of its coverage. The testimony about coverage and siting issues in the Gannon Affidavit is diminished due to his misunderstanding.

57.  Similarly, the PCS spectrum, of which Omnipoint is but one licensee, is presented as a "new generation of wireless service" (Plaintiffs' Memorandum, p.3; Gannon Affidavit, Plaintiffs' Motion Exhibit A ¶6, p. 2) in spite of the fact that the first PCS licenses were issued in the USA in 1995, nearly a decade ago, and GSM technology was already being deployed by PCS-equivalent services in Europe by that time. Also, one is left with the impression that Omnipoint is at the cutting edge with digital services while cellular services wallow in analog inefficiency and use higher power levels. (Gannon Affidavit, Plaintiffs' Motion Exhibit A  ¶¶ 7, 9, pp. 2, 3). Cellular services in the Boston region operate with the same digital technologies (GSM, CDMA, and the like) as PCS services, including Omnipoint, and their power levels are quite comparable. Consequently, this misinterpretation of how Omnipoint's technology fits into the larger picture of a robust competitive wireless industry might leave the layperson with the impression that, to compete, Omnipoint needs more facilities than other carriers. It is instructive that despite the similarities among the wireless services, the coverage of only one wireless carrier, Omnipoint, was presented to support the application for the 190-foot-high MCF tower, and was contrasted against non-existent analog-only cellular services. The vague assertions in the Plaintiffs' Memorandum  beginning on p. 8  about "carriers" reporting unreliable coverage and the subsequent choice of the Jordan Drive location to serve multiple carriers with a 190-foot tall tower are not supported by the facts. Only a very

thin and technically deficient coverage analysis from Omnipoint is provided to support 160 feet of the proposed 190-foot tower.

58.    The Plaintiffs also gloss over other alternatives and potential alternatives to the Jordan Road tower. In my experience evaluating site acquisition efforts, the effort described by Mr. Gannon in his Affidavit is typical. The low-hanging fruit is picked. That is, he made approximately eighteen (18) inquiries by mail (¶15). Of the two property owners who responded, both parcels were evaluated by someone's RF engineers (presumably Omnipoint's) and determined to satisfy coverage requirements (¶16). Finding the Andrews parcel on Jordan Drive the less expensive one to develop, MCF entered into a ground lease to develop the wireless tower there (¶¶17-19).

59.    The second site, the Ames Rifle and Pistol Club in Easton abutting the Andrews property was dismissed as "economically unfeasible" (¶18) in Mr. Gannon's opinion. Mr. Gannon provides no financial evidence or analysis for this conclusion. In contrast, the purchase of a hypothetical new vacant buildable parcel is discussed as an uneconomical option beginning at ¶27 and is supported by the estimated cost of parcel acquisition, albeit lacking any context to show whether revenues and expenses would make the new parcel unfeasible.

60.    While it is in MCF's interest to develop the easier, less costly site which in its opinion is the Jordan Drive parcel, this does not necessarily render the 88-acre Ames Rifle and Pistol Club unfeasible.

61.    It is my experience that wireless communications towers are located in remote locations all the time. One of the reasons for this is to avoid placing such facilities near or within

sight of residential neighborhoods. The Ames Rifle and Pistol Club parcel includes areas that are relatively remote from residential uses.

62.    I am familiar with the revenue and expenses relating to the construction and operation of wireless communications towers. A tower that is capable of serving six wireless carriers and potentially a plethora of other communications needs has significant revenue potential. A typical wireless tenant would pay a tower owner in this region from $24,000 to $36,000 per year. Thus, six tenants would generate at least $144,000 per year. Wireless sites are often leased by wireless tenants for 15 to 25 years. Once constructed, the expense of maintaining a tower is minimal: the cost of the land lease (often keyed as a percentage of revenue), periodic inspections, grounds maintenance, taxes and insurance are the primary operating expenses. Since the proposed tower is intended to serve multiple tenants, there would be substantial cash flow available to pay for more complex site development.

63.    Based on the foregoing, I conclude that developing the Ames Rifle and Pistol Club site is not "economically unfeasible" and remains a viable alternative to the proposed Jordan Road site.

64.    Similarly, the lack of mailed response from property owners of 16 other 3-plus acre parcels does not mean their parcels are unfeasible or unavailable. It just means personal contact and a sales pitch to owners might be necessary to obtain a positive response.

## POTENTIAL VISUAL IMPACT

65.    The visual impact of a tower on a community is best evaluated with the placement of a crane or balloon at the location of the proposed tower. It is important to place the crane

18

or balloon at the actual position of the proposed structure so that views of the crane or balloon will be a valid representation of the proposed tower.

66.    Regarding the July 10, 2004 balloon test, I personally visited the test and observed the test methodology. Mr. Gannon states, Affidavit ¶34, that 200 feet of balloon tether line was let out. This is insufficient to compensate for the wind drift of the balloon. As the wind blows a balloon laterally, its tether tilts diagonally and the balloon height diminishes. There was a moderate wind all day on July 10th.

67.    I use a laser rangefinder to measure balloon height from ground at such tests. The device, a Bushnell model 800, has a specified accuracy of $\pm$ 1 yard, and I have found it to be extremely reliable when measuring objects of known heights that are similar to this balloon height.

68.    Despite the reported 200-foot length of the tether, the balloon, driven by the wind that day, was bobbing typically between 100 to 130 feet above ground and on rare occasions topping out at 150 feet. This is consistent with the fact that the balloon was bobbing over a location approximately 50 yards from its anchor point. The balloon was also not centered over the location of the proposed tower, being about 100 feet off the mark.

69.    In short, the balloon test on July 10, 2004 failed to illustrate the visibility of a 190-foot tower at the proposed location. In my experience evaluating balloon tests, those executing such tests often fail to measure balloon height or do the trigonometry to figure out whether they have let out enough of the tether to achieve the desired height at the desired position. The result is that the test does not accurately depict the height of the proposed tower.

70. According the Gannon Affidavit, Plaintiffs' Motion Exhibit A, ¶32, p. 7, a balloon test was also conducted during the hearing process. If that previous test was conducted in the same manner as the test I witnessed, its accuracy is suspect as well.

71. Based on the photographs of the crane test in Plaintiffs' Motion Exhibit E, the crane test was conducted on an accessible portion of the parcel near the house and away from the wooded area of the proposed tower site. Because this location was not at the proposed tower position it did not provide a reliable depiction of the potential visibility of the tower.

CONCLUSION

72. It is my opinion that the facts on the record contradict Plaintiffs' claims of prohibition of service because the imprecise and incomplete coverage analysis does not prove a significant gap exists and the record does not prove the only viable option is a 190-foot tower at 76 Jordan Drive, particularly when pursuit of a number of identified alternatives is likely to be fruitful.

SIGNED UNDER THE PENALTIES OF PERJURY, this 23rd day of September, 2004.

_____
David P. Maxson

CERTIFICATE OF SERVICE
I hereby certify that a true copy of the above document was served upon the attorney of record for each other party by (hand) (mail) on September 24, 2004

20